### UNITED STATES of America, Plaintiff,

v.

### Herman L. WOMACK, Defendant.
### Cr. No. 41-60.

United States District Court
District of Columbia.

Dec. 4, 1962.

Hugh J. McGee, Washington, D. C., for defendant, for the motion.

David C. Acheson, U. S. Atty., and Frederick G. Smithson, Asst. U. S. Atty., Washington, D. C., opposed.

HOLTZOFF, District Judge.

This is a motion under 28 U.S.C. § 2255 in behalf of the defendant, who was convicted on charges of mailing obscene matter and circulars containing information where obscene matter can be obtained. The object of the application is to vacate the sentence on the ground that he was mentally incompetent to stand trial. The motion further prays for a dismissal of the indictment, or a direction of a verdict of not guilty by reason of insanity or for a new trial "at which a plea of not guilty by reason of insanity may be entered" by the defendant.[1] The present motion is made by counsel other than counsel who represented the defendant at the trial and on the appeal from the judgment of conviction.

As will appear more fully hereafter, the defendant's affidavit attached to the motion affirmatively and conclusively proves that not only was he competent to stand trial, but that he also actively participated with his counsel both in the preparation for the trial and in the presentation of his defense. Ad-

---

1. It is hardly necessary to observe that the law does not recognize any such plea.

ditional evidence fully supports this view. Consequently, the motion under 28 U.S.C. § 2255 to vacate the sentence and judgment of conviction on the ground of mental incompetency to stand trial, will be denied. The remaining phases of this application will also be discussed later.

In view of the unusual aspects of this case, a somewhat detailed summary of the issues and the proceedings, seems desirable. The indictment consists of numerous counts, each alleging a separate act of mailing. The period covered by it is from February 25, 1959 to December 18, 1959. The obscene matter involved in this case consisted of photographs of nude male persons, unaccompanied by any text. The subjects of the photographs were represented in lascivious and suggestive poses, with the camera obviously being focused so as to emphasize the private organs. The defendant was convicted on 29 counts, and on April 14, 1960 was sentenced to imprisonment for a term of one to three years on each count, the sentences to run concurrently. The conviction was affirmed by the Court of Appeals for the District of Columbia, 111 U.S.App.D.C. 8, 294 F.2d 204. In its opinion, the Court of Appeals stated:

"The photographs which are exhibits in this case are conclusive autopical proof of obscenity and filth."

\*     \*     \*     \*     \*     \*

"These are stark, unretouched photographs—no text, no possible avoidance of scienter, no suggested proper purpose, no conceivable community standard which would permit the indiscriminate dissemination of this material, no alleviating artistic overtones. These exhibits reflect a morbid interest in the nude, beyond any customary limit of candor. They are 'utterly without redeeming social importance.'"

The Court of Appeals made the following comment on the sentence imposed by this Court:

"The court directed that these comparatively mild sentences run concurrently. Therefore the validity of the judgment upon one count, relating to one of these exhibits, supports the sentence."

At the trial in this Court, the defendant was represented by Stanley M. Dietz, Esquire, an able and experienced member of the bar, specializing in the trial of criminal cases. The trial consumed six days. Two principal issues were raised by defense counsel. First, as the defense had the right to do, it put the Government to its proof. Considerable time was consumed in making formal proof as to each individual act of mailing. Second, the defendant denied that the photographs involved in this case were obscene. A large number of magazines, pamphlets, and similar material purchased and accumulated by the defendant in preparation for the trial, were tendered as proof of community standards, but were excluded by the Court. A number of expert witnesses were called, who expressed the opinion that the questioned material was not obscene.

There was no suggestion of any defense of insanity or of any lack of mental responsibility on the part of the defendant. There was no intimation of any mental incompetency to stand trial. Counsel for the defendant did not make any suggestion that he was unable to confer with his client intelligently, or that the latter lacked any understanding of the nature of the proceeding. In fact, as the Court personally observed from time to time during the trial, the defendant, who was seated at the counsel table alongside of his counsel, was constantly in conference with him. On at least one occasion, counsel for the defendant announced in open court that he had consulted his client on a particular matter that arose at the moment.[2]

2. Tr. p. 392.

The defendant was called as a witness in his own behalf and testified at length. On direct examination, he narrated his life history and related his career in considerable detail. He summarized his activities with some degree of particularity, stating that he was in the printing and publishing business and did commercial printing for a number of customers; that he published four magazines, and that every magazine had a subscription list. He explained how he built up his voluminous mailing lists, to which he had referred as "sucker lists". In addition to describing other details of his business, he recapitulated the conversations that took place between him and a Post Office Inspector at several conferences, at one of which his counsel, other than his trial counsel, was present. It was brought out that the defendant had purchased at various news stands and stores numerous periodicals, magazines, pamphlets, and similar material, which were offered in evidence, but excluded by the Court.

Some of the matters elicited on cross-examination are illuminating. Thus, he testified, in part, as follows:

"Q. Now, you remarked about your particular sucker list and how valuable it was to you, sir. Let me ask you then, since you brought that in: What was your return from your sucker list?

"A. I don't know. I have made money. Is that immoral?

"Q. You have made money off those pictures, is that it?

"A. I have made money.

"Q. You've made a considerable sum of money, isn't that true?

"A. Not as considerable as you infer. There are expenses in running any business." (Tr. pp. 517–518).

On further cross-examination, he gave the following testimony concerning his activities:

"Q. Tell me, when did you engage in the business of mailing nude photographs? When did you first begin it, sir?

"A. Oh, I believe the business began in last February, but the first photographs did not go out until the very last of March or first of April.

"Q. And that's March or April of '59?

"A. Yes.

"Q. Sir, had you been in this business before?

"A. No.

"Q. And you became acquainted with this business while you were a teacher?

"A. No.

"Q. Well, you were teaching at that time, weren't you?

"A. I was teaching part time. I was also directing a printing plant.

"Q. Well, that was a printing plant having to do with menus, wasn't it?

"A. It also had additional printing for over two hundred Washington businesses, banks, churches and a number of other organizations.

*       *       *       *       *

"Q. So you decided to go into this—as a sort of original idea with you, is that it?

"A. It was not original; I observed it being done all over the country.

"Q. It was a good money proposition, and you wanted to skim the cream while you could get it?

"A. The people who were doing it were making money. I have no objection to making money." (Tr. pp. 519–520)

Shortly after the affirmance of his conviction by the Court of Appeals, the defendant discharged his counsel and retained Hugh J. McGee, Esquire, who has filed the motion now before the Court. The motion is a tangled web and it is necessary to unravel its strands. It is entitled "a motion to vacate sentence and to dismiss the indictment." Apparently it is predicated on 28 U.S.C. § 2255. The basis of the motion is alleged mental incompetency of the defendant to stand trial. Obviously, if the motion is granted, the indictment may not be dismissed, but a new hearing must be ordered on the question whether the defendant was competent to stand trial. If it is found after taking testimony that he was not mentally competent at the time of his trial, it must then be determined whether he is now competent. If it is found that he is still incompetent, he must be committed to Saint Elizabeths Hospital to await his recovery, if any.

■ The motion seems to confuse, however, insanity as a defense to the indictment with mental incompetency to stand trial. Obviously the two concepts are drastically different.

> "There is a vast difference between that mental state which permits an accused to be tried and that which permits him to be held responsible for a crime."

Winn v. United States, 106 U.S.App. D.C. 133, 135, 270 F.2d 326, 328. Competency to stand trial depends on whether the defendants understands the nature of the proceedings against him and is properly able to assist in his own defense, D.C.Code § 24–301(a).

■ Incompetency to stand trial renders a conviction subject to collateral attack and, therefore, may be raised by motion under 28 U.S.C. § 2255, Smith v. United States, 106 U.S.App.D.C. 169, 270 F.2d 921; Brown v. United States (5th Cir., 1959), 267 F.2d 42; Bell v. United States (9th Cir., 1959), 269 F.2d 419. On the other hand, insanity at the time of the offense and mental responsibility for the crime are matters involved in the merits of the conviction and may not be asserted on such a motion. They are reviewable solely by direct appeal from the judgment. Bishop v. United States, 96 U.S.App.D.C. 117, 223 F.2d 582, reversed on another point, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); Hahn v. United States (10th Cir., 1949), 178 F.2d 11; Taylor v. United States (8th Cir., 1960), 282 F.2d 16.

Under certain limited circumstances, new facts may be advanced by a motion for a new trial on the ground of newly discovered evidence. The present motion, however, may not be so considered because it fails to comply with the requirements for such an application and apparently was not so intended by counsel. The two-year period prescribed by Rule 33 of the Federal Rules of Criminal Procedure within which such a motion may be made, has not as yet expired. If presented, this Court would deem it its duty to entertain it and to pass on its merits, especially in the light of the psychiatric testimony, which will be discussed later.

The present motion is supported by three affidavits. The first and prinicipal affidavit is made by the defendant himself. It contains the following statement:

> "I do remember a lot of the things that happened during the trial and its preparation although their sequence and many of the details are still very hazy and confused. It seemed like a horrible nightmare with some parts real. *Mr. Dietz and I had many discussions as to how to disprove the obscenity, and with this in mind contacted Drs. Karpman, London, Szollozi, Shapiro and Williams,* all of whom refused to testify as to the nature of the material because of their unanimous and positive opinion that I was a very sick man and in need of treatment for my mental condition. These psychiatrists' insistence on my mental illness and a plea of insanity disturbed and aggravated

me, but *I do remember suggesting the possibility of a plea of insanity to Mr. Dietz, if only as a 'strategic manuever'* (sic)".[3]

The affidavit then indicates that Mr. Dietz, the defendant's counsel at the trial, emphatically rejected the idea of injecting the issue of insanity. Thus it affirmatively appears by the defendant's own affidavit, beyond peradventure of a doubt, that he understood the nature of the proceedings against him, was able to and did consult with counsel, and, in fact, intelligently and actively participated with counsel in the preparation for trial.

The other affidavits annexed to the motion are made by two members of the staff of Saint Elizabeths Hospital, Dr. Wilbur A. Hamman, and Dr. Brigette M. Julian. Each affidavit is one page in length. The two are almost identical. Each states that Womack is suffering from a severe mental disease, but neither the name, the nature, nor the symptoms of the disease are given, nor the manner in which it manifests itself. A physician's statement that a person is sick, without indicating the nature of the ailment is worthy of but scant consideration. The affidavits further aver that the defendant could not appreciate the seriousness of his situation and refused to acknowledge the criminality of the acts with which he is charged. Unfortunately this attitude is frequently found in criminals, but it is not sufficient to render them mentally incompetent to stand trial. Finally, each affidavit concludes with the bald conclusion that the defendant was incapable of intelligently or competently assisting counsel in the defense of his case. No explanation or effort to particularize the statement is vouchsafed. The defendant's own affidavit, as has been shown, disproves this unsupported generalization. It is significant that no affidavit from the trial counsel is presented, although he is available.

It is well established beyond the necessity of detailed discussion that a motion under 28 U.S.C. § 2255 may not be judged merely as a pleading, but must contain a detailed factual showing. Otherwise, a full hearing with an opportunity to introduce evidence would be required in connection with every such motion, no matter how frivolous. In passing on such a motion the Court may consider all the files and proceedings in the case, Martin v. United States, 101 U.S.App.D.C. 329, 248 F.2d 651 (1957); Wilkins v. United States, 103 U.S.App. D.C. 322, 258 F.2d 416 (1958); United States v. Trumblay (7th Cir., 1958), 256 F.2d 615. In this instance, the motion and the accompanying affidavits manifestly not only fail to make a *prima facie* showing of incompetency to stand trial, but on the contrary they affirmatively disprove the contention.

This discussion would be far from complete without reference to a companion case. For this purpose it is necessary to depart from the chronological sequence and to return to an earlier event. As has been indicated above, the period covered by the indictment in this case is from February 25, 1959 to December 18, 1959. The trial took place from March 14, 1960 until March 21, 1960. Sentence was imposed on April 14, 1960. This Court permitted the defendant to remain on bond pending appeal, in view of the fact that this appeared to be the first case tried in this district subsequently to the formulation by the Supreme Court in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, of a definite test of obscenity.

Apparently the defendant either continued or resumed his illicit activities during the pendency of the appeal, and another indictment was returned against him (Criminal Case No. 756–61) charging that he committed similar offenses during the period from August 15, 1960 to November 10, 1960. Immediately after the Court of Appeals affirmed the conviction in the instant case, the defendant pleaded guilty to one count of

---

3. Emphasis and inner quotation marks supplied.

the second indictment. It was then that he changed counsel. He was permitted by the Court of Appeals to withdraw his plea of guilty. On the application of his counsel, the defendant was committed to Saint Elizabeths Hospital for a mental examination. The Hospital submitted two reports, several months apart. The second and final report, dated January 19, 1962, and contained in the Court file, reads, in part, as follows:

"We conclude, as a result of our observation and examinations, that *Mr. Womack is mentally competent to understand the nature of the proceedings against him and to consult properly with counsel in his own defense*, although he has not recovered from his mental illness. As stated in our previous report of May 26, 1961, it is our opinion that Mr. Womack is suffering from mental illness, Psychoneurotic Reaction, Obsessive Compulsive Reaction; was suffering from this mental illness during the period of August 13, 1960, through November 10, 1960; and *the criminal acts with which he is charged, if committed by him, were the product of this mental illness*." [4]

The second case came to trial on January 31, 1962 before Judge Schweinhaut of this Court. For the first time the issue of insanity as a defense was raised in behalf of the defendant. It must be emphasized, however, that there was no contention or even a suggestion that the defendant was mentally incompetent to stand trial. With the acquiescence of counsel for both parties, this Court indicated at the oral argument of the present motion that it would take judicial notice of the files and proceedings in the second case, and requested the Government to procure and supply a transcript of the psychiatric and psychologi-

cal testimony introduced at that trial. Preparation of the lengthy transcript required considerable time. This circumstance is the reason for the interval between the argument of the motion and this decision.

Members of the staff of Saint Elizabeths Hospital, who had participated in the examination of the defendant and had taken part in the conferences concerning him, were called as witnesses in his behalf. They were Dr. William G. Cushard, Dr. David J. Owens, Dr. Mauris M. Platkin, Dr. Wilbur A. Hamman, Dr. Bridgette M. Julian, and a psychologist, Dr. Katherine Beardsley. They unanimously agreed that the defendant was suffering from what they considered a mental disease known as "psychoneurotic reaction, obsessive compulsive type". They further expressed the opinion that he was not psychotic,—in other words, that he was not insane in the common understanding of that term.[5] His illness was a neurosis. It was stated that the disease consisted in a "pathological immersion in homosexuality".

█ What is important from the standpoint of the present motion is that Dr. Owens and Dr. Platkin testified that the disease did not impair the intellect, the intelligence, or the ability to conduct a business. Dr. Platkin stated that the defendant was a learned, intelligent man; that he could evaluate; and that he had freedom of the will to make a choice, and knew right from wrong. Dr. Owens testified that while at Saint Elizabeths Hospital, the defendant gave instructions to his business associates and assisted in the management of his business. Dr. Owens also expressed the view that the defendant was "up to date on the law"; that his illness did not interfere with his intellect; and that the patient could make plans. Obviously, if the de-

---

4. Emphasis supplied.

5. Until recent years the term "insanity" was a scientific term used by text writers on psychiatry and by psychiatrists. Psychiatry has changed its nomenclature sev-

eral times in a number of particulars, and prefers now to use the word "psychosis" instead of "insanity". We may not, however, discard the term "insanity", since it is used in the D.C.Code.

fendant could carry on such activities, he was mentally competent to stand trial.

Dr. Beardsley, the psychologist, stated that Womack's intelligence quotient was in the superior range, that it was 123, and that his actual intelligence was still higher. Dr. Winfred Overholser, the Superintendent of Saint Elizabeths Hospital, although he had not examined the defendant, testified from his study of the hospital record. The Superintendent likewise expressed the view that the defendant's intellect was not impaired and that he had a superior intelligence.

In addition to the psychiatrists of Saint Elizabeths Hospital staff, the defendant called two psychiatrists in private practice. Dr. Charles E. Goshen expressed the opinion that the defendant was psychotic, but was unable to state the nature of the psychosis. Dr. Leon Salzman advanced the view that the defendant was mentally ill, but gave no information as to the nature of the disease.

It was the conclusion of most of these witnesses that the crime, with which the defendant was charged, was the product of his mental disease, although Dr. Overholser and Dr. Hamman expressed a doubt on this point. It would seem that the only manner in which the defendant's criminal activities could be said to be the product of his mental disease is that his morbid and sick interest in homosexuality planted in his mind the idea of choosing his nefarious business as a method of making a livelihood. From the standpoint of this motion, the psychiatric testimony is important, because it conclusively demonstrates that the defendant did not suffer from any impairment of the intellect; that he was able to conduct the ordinary affairs of life, including business enterprises; and that he fully understood the nature of the charges against him, was able to consult with counsel and assist in his own defense.

Reference to the psychiatric testimony introduced in behalf of the Government at the trial of the second case seems desirable. The Government called as its expert witness Dr. John R. Cavanaugh, who had examined the defendant at its request. Dr. Cavanaugh felt that the defendant had a classifiable psychiatric disorder. His diagnosis was "sociopathic personality disturbance". The doctor qualified his answer, however, by stating that the defendant did not have a sick sociopathic personality; that his affliction was purely a behavior disorder, which to some, perhaps to a large, extent caused him to act the way he did, but that he retained responsibility for his acts. In Dr. Cavanaugh's opinion the defendant was not suffering from an "obsessive compulsive reaction" and there was no direct causal relation between his personality disturbance and the crime with which he was charged. On cross-examination, Dr. Cavanaugh stated that the defendant had no mental disease; that his sociopathic personality was not the cause of his acts; and that his disorder was not mental but "behavioral". In answer to further questions Dr. Cavanaugh said that the defendant could not be civilly committed to a mental institution, and that homosexual tendencies in themselves, do not constitute a mental disease.

Although there were these differences of opinion among the expert witnesses, both as to the presence or absence of mental disease and as to the causal connection between the disease and the crime, the trial judge directed an acquittal on the ground of insanity.[6] While this disposition of the case would naturally bar a new prosecution for the offenses covered by the indictment, because of double jeopardy, it does not con-

6. Recently the Court of Appeals in McDonald v. United States, D.C.Cir., 312 F. 2d 847; and in Hawkins v. United States, D.C.Cir., 310 F.2d 849, indicated that issues of the type presented at the trial of the second case should be resolved by the jury. It is not inconceivable that if those decisions had been rendered prior to the trial of the second Womack case, the trial judge might have submitted the case to the jury.

**586**

stitute an adjudication of insanity. It is merely a ruling that in the opinion of the trial judge the Government has not sustained its burden of proof beyond a reasonable doubt on the issue of mental responsibility. As previously stated, however, the expert testimony given at that trial is germane to the motion now before this Court, and bears directly on the question of the defendant's mental competency to stand trial.

In the light of the foregoing discussion, the Court concludes that the motion under 28 U.S.C. § 2255, should be denied on the ground that the motion and the files and records of the case conclusively show that the defendant is entitled to no relief. This denial is without prejudice to a motion for a new trial on the ground of newly discovered evidence.