Anthony MIRRA, Movant,

v.

UNITED STATES of America,
Respondent.

No. 66 Civ. 83.

United States District Court
S. D. New York.

July 5, 1966.

Jerome Lewis, Brooklyn, N. Y., for movant.

Robert M. Morgenthau, U. S. Atty., Southern District of New York (Michael W. Mitchell and John H. Adams, Asst. U. S. Attys., Southern District of New York, of counsel), for respondent.

## OPINION

MacMAHON, District Judge.

Petitioner was one of thirteen defendants convicted by a jury of conspiracy to violate the federal narcotics laws after a ten-week trial. He moves under 28 U.S.C. § 2255 to vacate and set aside the judgment of conviction and sentence imposed upon him on July 10, 1962. He also moves to disqualify the trial court from considering his § 2255 application on the grounds that the court "is of necessity a material witness" [1] and "has previously shown an intense personal bias and prejudice against petitioner." [2] We deny the motions.

Petitioner bases his application for relief under § 2255 on two related grounds: first, he claims that during part of the trial he was not mentally competent to have understood the proceedings against him and to have been able properly to assist in his own defense, and, second, that an oral motion made by his attorney during trial for a psychiatric examination was "unconstitutionally and illegally" denied by the trial judge without holding a hearing.

Stripped of the embellishments, arguments, opinions and conclusions which saturate the supporting affidavits of petitioner and his present counsel, the facts alleged show that, following an abortive six-month trial, the second trial of petitioner and thirteen other defendants for conspiracy to violate the federal narcotics laws began on April 2, 1962. After two months of trial, on June 4, 1962, at 10:30 A.M., while under cross-examination about a prior conviction for conspiracy to violate the federal narcotics laws,[3] petitioner picked up the witness chair and threw it at the prosecutor. The chair shattered against the jury rail. Following a two-hour recess,[4] petitioner's trial attorney reported that: "he thought" petitioner was "not in control of himself;" "he has been incoherent when I tried to talk to him;" "he complained of being sick" and that counsel tried to consult with him and that he just "couldn't get through to him now. There is a block there." Trial counsel then moved "to commit Mr. Mirra to Bellevue or whatever appropriate place there is for examination by a qualified psychiatrist." The court denied the motion stating its reasons upon argument held after the close of the day's testimony.[5] We also granted trial counsel's request to remove petitioner from the stand and defer his cross-examination.[6] The jury was excused. Mirra was returned to his chair, and as he was being gagged and shackled, he stated "why are you going to gag me for?" One witness testified on direct examination before the luncheon recess.[7]

---

1. 28 U.S.C. § 455.

2. 28 U.S.C. § 144.

3. See United States v. Stromberg, 268 F.2d 256 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959).

4. The two-hour delay was required to replace the witness chair, bolt it to the stand, and obtain restraining equipment from the New York City police department in order to prevent a recurrence of such misconduct.

5. Earlier in the trial, we found it necessary, because of countless motions and applications, to rule that all motions and applications would be heard at the close of the day's testimony (Tr. 5666), otherwise interruptions would have resulted in interminable delays which would surely have outlasted the alternate jurors, as on the first trial.

6. We did not say "until a time when he can cooperate in his own defense," as Mr. Lewis tries to suggest on page 16 of his affidavit by putting trial counsel's words into the court's mouth. See trial transcript, p. 6469.

7. The witness Drolet's testimony, almost totally hearsay, was favorable to petitioner's claim that the witness Cadieux

The trial resumed at 2:15 P.M., and most of the afternoon, while other witnesses testified, petitioner's trial counsel reported that: he "got no response" when he tried to talk with petitioner; petitioner "said he had a headache;" said he had been given two pills by the Courthouse nurse; "appeared to be asleep" and said he could not remember testimony. At the conclusion of the day's testimony, trial counsel moved for a mistrial and a psychiatric examination on the ground that "it was impossible to consult with [petitioner] at all at this time." The court denied the motions on the merits. It stated its reasons for finding bad faith and lack of any genuine factual issue or basis whatsoever for a psychiatric examination or hearing.[8] At the same time, the court reserved decision on whether to hold a hearing on counsel's claim that petitioner had been given sedatives which induced sleep. The next day, petitioner's counsel continued, on and off, to report that petitioner was not responsive. After trial a hearing was held and the court found, on the basis of documentary evidence and testimony, that petitioner had been given an aspirin-like compound which did not induce sleep and concluded that at the time of the incidents of June 4 and 5 petitioner was able to stand trial, comprehend the nature of the proceedings and communicate with counsel.

■ Thus, petitioner's own papers show, as does the trial record, that the grounds which he now urges as a basis for collateral relief were presented to and rejected on the merits by the trial court.

The appellate records show that those grounds were not raised on direct review in either the Court of Appeals, United States v. Bentvena, 319 F.2d 916 (2d Cir. 1963), or in the Supreme Court, Mirra v. United States, 375 U.S. 940, 84 S.Ct. 360, 11 L.Ed.2d 272 (1963). The government now contends that the judgment is not "vulnerable to collateral attack" under § 2255 because habeas corpus will not be allowed to do service for an appeal absent some valid excuse or exceptional circumstances.[9] Put another, and we think a more current, way, petitioner is foreclosed from federal collateral relief if he by-passed normal appellate procedure deliberately or through inexcusable neglect.[10]

■ While the ultimate burden of proving deliberate by-passing or inexcusable neglect may well be on the government,[11] we believe that where, as here, the government has carried its burden of pleading,[12] petitioner must at least come forward with some averment which would permit a finding upon a hearing that he had not deliberately by-passed his right to appellate review.[13] That procedure is especially appropriate in a case like this. There was no barrier to, or intolerable risk presented by, normal appellate procedures. Petitioner had competent counsel. The essential facts are in the record, and there is no claim of newly discovered evidence. The explanatory facts, if any, lie peculiarly within the knowledge of petitioner. Petitioner is now represented by experienced counsel of his own selection. He claims no present disabil-

---

had committed perjury for pay when she testified for the government in the prior trial. Tr. 6473–6499.

8. Tr. 6546–6550.

9. Sunal v. Large, 332 U.S. 174, 178, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947).

10. Sanders v. United States, 373 U.S. 1, 18, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); Fay v. Noia, 372 U.S. 391, 438–439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Townsend v. Sain, 372 U.S. 293, 317, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

11. See Sanders v. United States, supra, 373 U.S. at 28–29, 83 S.Ct. 1068; Hill

v. United States, 236 F.Supp. 155, 158 (E.D.Tenn.1964); The Supreme Court, 1962 Term, 77 Harv.L.Rev. 62, 143 n. 18, 148 n. 46 (1963).

12. See Sanders v. United States, supra, 373 U.S. at 10–11, 17, 21, 29, 83 S.Ct. 1068.

13. Cf. Nash v. United States, 342 F.2d 366 (5th Cir. 1965); United States ex rel. Tangredi v. Wallack, 236 F.Supp. 205, 207–208 (S.D.N.Y.1964), modified, 343 F.2d 752 (2d Cir. 1965); Carpenter v. Gladden, 223 F.Supp. 612, 614 (D.Ore. 1963).

ity, and his moving affidavits, as well as the official records, conclusively show that the grounds asserted as a basis for collateral relief were pressed at trial but not raised on appeal.

It is our duty to give practical form for the application of the principles governing collateral relief.[14] Surely, in the circumstances shown here, sound judicial administration requires that petitioner at least aver some adequate explanation for by-passing normal appellate procedures in order to obviate unnecessary hearings should it appear that the explanation is insufficient. Two explanations are advanced. The first, suggested by petitioner, is that he has no memory of the facts alleged as a basis for his motion and did not learn of them until they were brought to his attention in subsequent court proceedings and until he had read the trial transcript after he began serving his sentence. The second, asserted by counsel in a reply memorandum, is that petitioner's appellate counsel deliberately failed to raise these available points as a matter of strategy. Significantly, petitioner does not state categorically that he did not know of the facts upon which he now relies *at the time of his appeal.* If he means to imply that he did not know them when he appealed, the explanation is patently false.

The record conclusively shows that at the time petitioner filed his brief on appeal, December 26, 1962, and at the time of argument, January 30, 1963, both petitioner and his appellate counsel did know of the facts and claims which petitioner now makes. On June 26, 1962, the court sentenced petitioner for contempt and cited and read to petitioner the transcript of the trial record relating to petitioner's throwing the witness chair at the prosecutor (Tr. 9089–9092). He was also made aware of his counsel's claim that he was not in control of himself when and after he threw the chair and that his counsel had so informed the court (Tr. 9096–9097). When asked if he had any-

thing to say in his behalf before the court pronounced sentence, petitioner replied:

"Nothing much, your Honor, except that I am a hothead, period.

\* \* \* \* \* \*

Well, I am sorry for the chair incident, your Honor. The other things I didn't realize were contemptible. I just was shooting off my mouth. I didn't realize that was contempt." (Tr. 9098–9099.)

Petitioner appealed from his contempt conviction and filed a brief in the Court of Appeals July 17, 1962 in which, among other things, he argued:

"There is no question that the appellant's act of June 4, in throwing a witness chair in the direction of the prosecutor (Tr. 6461–6464), was obstructive of the administration of the trial and it is not intended to urge a contrary conclusion on this appeal. It is however submitted that the very irrationality of the act necessitated, on the question of appropriateness of the punishment, an inquiry by the trial Court into the appellant's state of mind when the act was committed. \* \* \*

After the incident, appellant's counsel requested a recess to permit him to talk to the appellant, a request which was granted (Tr. 6465). Counsel subsequently informed the Court that appellant was incoherent and moved that he be examined by a psychiatrist, a motion which was denied (6467). After appellant was returned to the stand, counsel informed the Court that he was not responsive to interrogation regarding a matter clearly within his knowledge (Tr. 6468). At the proceedings at which appellant was found in contempt, counsel reiterated in mitigation his observation that appellant had not been in control of himself at the time the incident occurred (Tr. 9097).

The failure of the trial Court to order an inquiry into appellant's mental condition would not have altered the disruptive character of the act itself,

---

14. Townsend v. Sain, supra, 372 U.S. at 319, 83 S.Ct. 745.

but would have had a bearing on the appellant's state of mind and intent when the act was committed, and thus on the appropriateness of the sentence to be imposed." (Government's Appendix, Exhibit "A," pp. 9–11, filed in opposition to this motion.)

On July 20, 1962, the Court of Appeals affirmed petitioner's contempt conviction in a *per curiam* opinion. United States v. Bentvena, 304 F.2d 883 (2d Cir. 1962). On August 3, 1962, petitioner filed a *pro se* petition for certiorari seeking review of the Court of Appeals' affirmance of his contempt conviction. That petition attaches a transcript of the contempt proceedings in the district court, petitioner's brief in the Court of Appeals, and the *per curiam* opinion of the Court of Appeals.[15]

The record, therefore, conclusively demonstrates that five months before his brief was filed on direct review from his conviction, both petitioner and his appellate counsel knew of the facts and claims now made, were able to assert his rights, and were aware of their significance. The record also shows that petitioner is neither immature, illiterate, nor uneducated.[16] Nor is he a stranger to appellate procedures, for he had appealed a prior conviction as well as his conviction for contempt. There is nothing in the record or petitioner's papers to suggest mistake, inadvertence, ignorance, inadequacy of appellate remedy, change in the law, lack of jurisdiction or any exceptional circumstances whatever for by-passing appellate procedures.

■ We think these indisputable facts compel the conclusion that petitioner and his counsel knew of the facts and claims on which he now relies and of their significance, but deliberately decided not to raise them on direct review. His present counsel's explanation that appellate counsel unilaterally decided not to raise the points on appeal is, we think, incredible. The trial record shows that petitioner's trial and appellate counsel hardly made a move without consulting petitioner. Strangely, there is no affidavit from appellate counsel, although petitioner's papers show that he knows where to find him. It is strange also that present counsel suggests the excuse not by affidavit, but by memorandum, and, even then, fails to state that he so much as interviewed appellate counsel. In any event, the proferred excuse is insufficient as a matter of law for counsel's choice of strategy is binding on the accused unless "exceptional circumstances" exist. Henry v. State of Mississippi, 379 U.S. 443, 451, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965). Here, petitioner does not allege the existence of exceptional circumstances, nor, indeed, do we find any on our own.[17] In particular, there is not even an allegation that petitioner was not consulted about the points to be raised on appeal.[18]

■ Accordingly, since petitioner has failed to come forward with any legally sufficient reason for failing to present known claims on direct review, he is procedurally barred from presenting them here.[19] Even if this procedural barrier were hurdled, petitioner's motion would still be denied, for the "application, files, and records of the case alone," [20] conclusively show that his claims have no merit.

The merits of this application cannot be understood out of the context of the trial. Petitioner was one of twenty-nine defendants accused of violating the federal narcotics laws. He was tried with thirteen codefendants and all but one were convicted. This trial, lasting two and one-half months, had been preceded

15. See Exhibit "B" to Government's Appendix filed in opposition to this motion.

16. Exhibits "B" and "J" to Government's Appendix.

17. Cf. Whitus v. Balkcom, 333 F.2d 496 (5th Cir.), cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964).

18. See Fay v. Noia, supra, 372 U.S. at 439, 83 S.Ct. 822, 9 L.Ed.2d 837.

19. Townsend v. Sain, supra, 372 U.S. at 317, 83 S.Ct. 745, 9 L.Ed.2d 770.

20. Sanders v. United States, supra, 373 U.S. at 15, 83 S.Ct. at 1077, 10 L.Ed.2d 148; 28 U.S.C. § 2255.

the year before by a trial which had turbulently crawled "along its rocky road for six months over every conceivable type of obstruction and interruption" before ending in a mistrial on the eve of summations when "the foreman of the jury broke his back in an unexplained fall down a flight of stairs in an abandoned building in the middle of the night." [21] The first trial was so "bedeviled by frequent delays" and "impeded by apparent illness, accident and other misfortune," [22] that the trial judge, in order to insure defendants' continued presence, ordered the remand of all defendants. The remand was upheld by the Court of Appeals, which stated that Judge Levet "may well have detected a general pattern of conduct not attributable to less than all of the defendants." United States v. Bentvena, 288 F.2d 442, 446 (2d Cir. 1961).[23] Later, as a result of their misconduct at the initial trial, petitioner and another defendant were held in contempt. Petitioner's contempt sentence of twenty days was characterized by the Court of Appeals as severe. United States v. Galante, 298 F.2d 72 (2d Cir. 1962).

Between trials, defendants were enlarged on bail. The case appeared on the trial calendar monthly, but "[o]n each occasion it was adjourned because a number of the defendants said that they had been unable to retain counsel notwithstanding their ability to raise substantial bail. As early as July 31, 1961, Judge Murphy sensed 'that the failure to retain counsel was part of a plan to postpone trial.' Despite efforts of the court and threats of contempt proceedings, it was not until March 9, 1962, that all defendants who had not been severed on the government's motion had counsel, either retained or appointed by the court. After further delays and substitutions of counsel * * * the [sec-ond] trial began [before this court] on April 2." [24] The first outburst by a defendant occurred on the opening day of the trial. Two days later, on April 4, the defendants on bail were again remanded to custody, and again the Court of Appeals upheld the remand, stating that the incidents on which the trial court had relied "might well seem to indicate a renewal of the 'misadventures of the previous trial * * *.'" United States v. DiPietro, 302 F.2d 612, 613 (2d Cir. 1962).

During the second trial, defendants and certain of their counsel claimed numerous incapacitating illnesses and injuries which physical examinations failed to substantiate. All of this interrupted and delayed the trial. Several defendants claimed inability to understand the proceedings and consult with counsel due to aspirin-like medication administered by court and prison medical personnel. United States v. Bentvena, supra, 319 F. 2d at 930. Two defendants, one before and one after petitioner, claimed that they were not competent to stand trial. Trial was delayed for four days while psychiatric examinations were conducted and evidentiary hearings held to determine the first claimant's competency to stand trial. His claims were found to be groundless.

Throughout the trial, the court was swamped with requests for delays, continuances, adjournments and the like. Indeed, on the basis of nothing but the cold record, Judge Moore was prompted to say that "[o]ne with a bent for statistics would find, no doubt, that if this trial were continued on every occasion that one or more of the defendants or their counsel so requested the trial would still be in progress." United States v. Bentvena, supra, 319 F.2d at 936.

Spurred by successful frustration of the first trial, a preview of the over-

21. United States v. Bentvena, 319 F.2d 916, 929 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963).

22. United States v. Bentvena, 288 F.2d 442, 445 (2d Cir. 1961).

23. The remand was also upheld by Mr. Justice Harlan acting in his capacity as Circuit Justice. Fernandez v. United States, 81 S.Ct. 642, 5 L.Ed.2d 683 (1961).

24. United States v. Bentvena, supra, 319 F.2d 929.

whelming evidence against them, and awareness that any sentence for contempt could not begin to equal the mandatory minimum facing them if convicted, the defendants again resorted to every conceivable means to abort the second trial. Phony accidents and illnesses of defendants and their counsel were routine. Verbal outbursts were commonplace. On one occasion a defendant tried to break into the robing room screaming obscenities at the judge; on another, a co-defendant climbed into the jury box, walked along the inside rail from one end of the box to the other, pushing the jurors in the front row and screaming vilifications at them, the judge and the other defendants. His brother, not to be outdone, screamed obscenities at the court and prosecutor. Petitioner threw the witness chair at the prosecutor. Referring to this and other misconduct, the Court of Appeals said:

> "We have described only two of the more dramatic disturbances which plagued the trial of this case for we find it neither necessary nor judicious to publicize or preserve the vile language and rebellious conduct that characterized this trial. Suffice it to say that more abhorrent conduct in a federal court and before a federal judge would be difficult to conceive." Id. at 930.

Off-stage activities by defendants and counsel designed to delay the trial were the order of the day. In order to deal with these deliberate disorders, the court directed that defendants and spectators be searched before entering the courtroom, that a large force of marshals be stationed therein, and that petitioner and and two of his co-defendants be gagged and shackled during the later part of the trial. The Court of Appeals subsequently upheld these measures, remarking that:

> "If any one distinct impression is gained from a scrutiny of the record here, it is that the trial judge was justified, indeed was forced, to resort

to stern measures to obtain order in his courtroom.

\* \* \* \* \* \*

We have satisfied ourselves that the prosecution did not provoke the incidents. The judge did all in his power to minimize their effect, and we find no ground for reversal in the circumstances. Any other answer to these contentions would produce little less than anarchy.

\* \* \* \* \* \*

Law enforcement and fair trial for those accused of violations is not to be limited to the pattern chosen by defendants. The administration of criminal justice in the federal courts will not be delivered into the hands of those who could gain only from its subversion. Our decision in Aviles is as applicable to a trial of two defendants as it is to a trial of fourteen. It may take two to conspire but it takes only one to throw a chair at a prosecutor.

\* \* \* \* \* \*

In view of the unprecedented tactics employed to impede the continuance and resolution of this trial, we find that the actions and rulings of the trial judge were reasonable and often necessary to prevent the frustration of justice." Id. at 930–932.

At the end of the trial, the court held eleven defendants, including petitioner, in contempt for their misconduct. United States v. Bentvena, 304 F.2d 883 (2d Cir.), cert. denied, Mirra v. United States, 371 U.S. 927, 83 S.Ct. 296, 9 L. Ed.2d 234 (1962). This misconduct demonstrated, the Court of Appeals held, "a concerted effort to interfere with the judicial process," United States v. Galante, 308 F.2d 63, 64 (2d Cir. 1962), quoted, United States v. Bentvena, 308 F.2d 47, 48 (2d Cir. 1962), a conclusion shared by nine different appellate judges who, in one context or another, have reviewed defendant's conduct at either or both of the trials.[25]

---

25. See United States v. Bentvena, supra, 319 F.2d 916 (Judges Moore, Smith and Hays); United States v. Panico, 308 F. 2d 125 (2d Cir. 1962) (Judges Moore and

On Friday, June 1, 1962, two months into the second trial, petitioner, against the advice of counsel, took the stand to testify in his own defense. He was entirely oriented, rational and responsive. Late Friday afternoon, he called other defendants "dope pushers" and, of course, provoked a chorus of delaying, but unsuccessful, motions for a mistrial. On Monday, June 4, at about 10:30 A.M., the Assistant United States Attorney began to cross-examine petitioner about a prior narcotics conviction. Petitioner picked up the witness chair, and threw it at the prosecutor, who was at that time reading the prior indictment to the jury. The chair narrowly missed its intended target and shattered against the jury box. Petitioner was immediately seized by several marshals and forcibly removed from the courtroom. We have already recounted the events following the chair-throwing incident and the court's adverse ruling on a motion for a psychiatric examination, and there is no need to repeat them.

■ It is in the context of this transparent plot to subvert justice that petitioner's present claims must be assessed. Petitioner now claims that the denial of his motion for a psychiatric examination was error and that if it is determined at a hearing that an examination should have been held, his motion to vacate sentence must be granted. A motion for a psychiatric examination under 18 U.S.C. § 4244 will not be granted if it is not made in good faith or if it is based upon a frivolous ground.[26]

■ We think it plain that petitioner's motion at trial was frivolous and not made in good faith. Petitioner's behavior at the prior trial, pre-trial and trial was entirely rational.[27] Indeed, he was in fact engaging in self-serving communications with counsel at the very moment his counsel was reporting his inability to communicate. There was no earlier or contemporaneous claim or showing of any history of mental illness, drug addiction or anything else which might impair his mental faculties. He had twice seen the government's overwhelming evidence against him. United States v. Bentvena, supra, 319 F.2d at 926. He knew that four days had been consumed by a co-defendant's psychiatric examination and hearings. He faced a mandatory minimum sentence of five years and, in all probability, in view of his criminal record, twenty years if convicted. Against this, he knew that any sentence for contempt would be a slap on the wrist. United States v. Galante, supra, 298 F.2d at 75–76. He was already incarcerated. United States v. Stromberg, 268 F.2d 256 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed. 2d 102 (1959). Five defendants at the first trial were not retried. A material witness against the defendants on the first trial (Cadieux) recanted by affidavit and refused to testify on the second trial except by deposition in Canada on motion of the defendants. In short, the defendants had everything to gain by a mistrial and virtually nothing to lose.

Considering these facts in the context of this trial and the incentive to provoke a mistrial, we have no doubt now, as we had no doubt then, that the motion for a psychiatric examination was frivolous

---

Smith, Judge Friendly dissenting), vacated on other grounds, 375 U.S. 29, 84 S. Ct. 19, 11 L.Ed.2d 1 (1963); United States v. Galante, 308 F.2d 63 (2d Cir. 1962) (Judge Kaufman); United States v. Bentvena, 308 F.2d 47 (2d Cir. 1962) (Chief Judge Lumbard); United States v. DiPietro, 302 F.2d 612 (2d Cir.1962) (per curiam) (Judges Friendly, Smith and Marshall); United States v. Bentvena, 288 F.2d 442 (2d Cir. 1961) (Chief Judge Lumbard, Judge Waterman and Judge Madden, United States Court of Claims, sitting by designation).

26. Cf. Lebron v. United States, 97 U.S.App. D.C. 133, 229 F.2d 16, 18 (1955), cert. denied, 351 U.S. 974, 76 S.Ct. 1035, 100 L.Ed. 1492 (1956); Wear v. United States, 94 U.S.App.D.C. 325, 218 F.2d 24, 26 (1954).

27. Petitioner's statements and acts throughout the pre-trial and post-trial proceedings are accurately summarized at pages 22–35 of the affidavit of Michael W. Mitchell, sworn to February 23, 1966 and submitted in opposition to this motion, and we adopt that summary as though fully set forth in this opinion.

and in bad faith. We would be naive indeed not to have found that petitioner's misconduct and motion were merely his part in a plot to frustrate justice and but another of the "unprecedented tactics employed to impede the continuance and resolution of this trial * * *." United States v. Bentvena, supra, 319 F.2d at 932.

Petitioner's second claim is that he was mentally incompetent to stand trial on June 4 and 5, 1962. In addition to his unresponsiveness of June 4, recounted earlier, petitioner alleges that his sleepiness continued into the next day of trial. He further asserts that he remembers nothing at all from the "time of [his] cross examination * * * until the Chief Marshal * * * told [him] * * * that a nurse had given [him] a pill;" that "the remainder of that whole day of June 4, 1962 is very vague in [his] memory;" and that "the following day is clearer but still vague. * * *" Petitioner avers that preceding his cross-examination, he had been "needled by the Government agents who were in the Courtroom," which annoyed and irritated him, and that for "many days and perhaps some weeks" before taking the stand, he had suffered from "constant headaches and nervous tensions and had been feeling quarrelsome." Petitioner further alleges, without independent supporting evidence, that he sustained two head injuries during his youth, and that before being accepted by the Army in 1945 he was rejected for service in the United States Maritime Service (Merchant Marine) in 1943 or 1944 because of mental instability.

Accompanying petitioner's motion is an affidavit of his present counsel which is loaded with conclusions and embellishments while purporting to amplify petitioner's allegations on the basis of the record, two memoranda of law, and an affidavit of a psychiatrist based in part on the affidavits of petitioner and his counsel. Petitioner's papers do not raise the issue of mental incompetency to stand trial because the allegations of fact are patently false, incredible, unreliable or irrelevant. In deciding a motion under § 2255, we are not deprived of all discretion and common sense, nor need we give credence to unbelievable allegations. Machibroda v. United States, 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); United States v. Farrar, 346 F.2d 375, 376 (7th Cir. 1965); United States ex rel. McGrath v. LaVallee, 319 F.2d 308, 312 (2d Cir. 1963). That petitioner's claim is without merit is perfectly clear from the records of the case.

Petitioner's suggestion that he does not remember, and never has remembered, throwing the chair is impossible to believe for, as we have recounted, less than a month after the incident the trial court read the transcript record of the incident to him and asked him if he had anything to say before the court sentenced him for contempt. Petitioner responded: "Nothing much, your Honor, except that I am a hothead, period. * * * Well, I am sorry for the chair incident, your Honor." A fair reading of this excerpt shows that petitioner knew he threw the chair, remembered throwing it, and realized both at the time he threw it and at the time of his sentence for contempt that it was a conscious, deliberate act.[28] When he was sentenced for conspiracy, he again expressed contrition: "I'm sorry for my conduct during the trial, if it means anything now. I can't help it because I am hotheaded."

Petitioner's outspokenness at both trials on matters he thought favorable to him, his expressions of contrition, coupled with his failure to claim lack of memory until now, when it is probably impossible to try him again, demonstrate the falsehood of his allegations.[29]

---

28. Petitioner was also made aware of the fact that he threw the chair, an occurrence he now denies remembering, on June 26, when he was sentenced for contempt, on July 10, when he was sentenced on the challenged conviction, and again on July 16, 1962, when he was arraigned for assaulting the prosecutor.

29. When petitioner was arraigned before Judge Bryan on July 16, 1962 and handed a copy of the indictment charging him with assault for throwing the chair at the pros-

 The claim that petitioner was "incoherent" during the recess following the chair-throwing incident, that he could not communicate with counsel during that time, and that he remembered nothing of the recess until the chief marshal told him that a nurse had given him a pill, is also incredible, for five weeks later, at a hearing [30] to determine the possible effects of medication given him during the recess, petitioner testified about some of his movements during the recess and gave details concerning the administration of the medication, including a conversation he had with the nurse. The testimony reveals that at the time in question petitioner was sufficiently alert to observe and comprehend acts and to participate intelligently in conversations, and, this being so, we have no doubt whatever that his non-responsiveness and sleepiness were feigned. Plainly he was sufficiently alert and sufficiently coherent to have communicated with counsel had he so desired.

 Petitioner's allegation that he was "asleep or sleepy" the remainder of June 4 and the whole of June 5 and unable, as a result, to communicate with counsel, defies belief, for on the afternoon of June 4, petitioner was not too sleepy or incommunicative to tell counsel that a nurse had given him two pills, to claim that he had a headache, and to observe and remember that a person named Moscowitz testified. Moscowitz testified briefly on the afternoon of June 4, yet on June 19, when petitioner resumed the stand for redirect examination, he testified that a person known to him as "Murray" was the same Moscowitz who had testified earlier. Surely, if petitioner was alert enough on the afternoon of June 4 to note the fact that Moscowitz was testifying and communicative enough to inform counsel that a nurse had given him two pills and that he had a headache, he was not too sleepy to discuss the strategy of his trial with counsel.[31] It is also worth noting that on his second appearance on the witness stand, petitioner's testimony and demeanor were entirely rational, and there was no claim or suggestion that he was incompetent.

 The affidavit of the psychiatrist concludes that for a period of time

---

ecutor, he did not claim non-recollection or mental incompetency, but merely stated, "I was already given a sentence for this here," apparently referring to his sentence for contempt. Petitioner now claims that late in April or early in May 1964 he interviewed his present attorney because he had found certain items in the trial record which caused him to hope that he would be able to prove that his conviction was unconstitutional. Yet, on May 1, 1964, before Judge Weinfeld, petitioner acknowledged full responsibility for the chair-throwing when he pleaded guilty to the assault. At that time, he stated that he understood the charge, that he had consulted with an attorney and given him the facts, and that he was pleading guilty because in fact he was guilty. He made no claim of non-recollection or mental incompetence.

30. Petitioner's trial counsel claimed that the alleged sleepiness was due to medication administered by Courthouse and prison personnel. Accordingly, on July 9, 1962, five weeks after the alleged sleepiness and two weeks after the verdict, the issue was explored at a hearing and decided against petitioner. The medication was an aspirin-like compound which would not induce sleep. Petitioner testified on that hearing and swore that he did not remember the identity of witnesses who had testified on the afternoon of June 4, 1962, but that testimony is squarely in conflict with petitioner's testimony on June 19, when he remembered the testimony of Moscowitz, who had testified on the afternoon of June 4.

31. Even if petitioner were incoherent during the recess following the chair-throwing incident and in fact unable to communicate with counsel at that time, we cannot see that it matters. When petitioner returned from the recess, the government revealed that it had completed its cross-examination, and the court permitted petitioner's counsel to defer redirect to a later time. The jury then returned from the recess, and other witnesses were examined. Not until two weeks later did petitioner retake the stand for redirect examination. Under the circumstances, even if we assume the truth of the allegation, we fail to perceive how an inability to communicate with counsel during a two-hour recess can constitutionally require us to render abortive a ten-week trial.

encompassing the chair-throwing episode and its aftermath, petitioner was a "sociopathic personality" who may well have been mentally incompetent to stand trial. The mere submission of a psychiatrist's opinion, especially one as inconclusive, argumentative and ill-founded as the one offered here, does not compel us to grant a hearing. United States v. Womack, 211 F.Supp. 578, 583 (D.D.C.1962). Here, the psychiatrist never saw or examined petitioner but formed his speculative opinion on the basis of isolated excerpts from the trial transcript, portions of appellate records, "drafts" of affidavits and "conferences" with petitioner's counsel. This vague underpinning is patently inadequate as a basis for an expert opinion. It is not surprising, therefore, that at best the psychiatrist offers only a guess that petitioner "might have been subject to temporary psychotic episodes." As we have noted, the affidavits of petitioner and his counsel are so saturated with embellishments, opinions, arguments and conclusions as to be completely unacceptable as a foundation for expert opinion. Moreover, one of the alleged facts on which the psychiatrist relies—Mirra's lack of memory of throwing the chair—is demonstrably false. The psychiatrist failed to indicate what weight he accorded to that allegation or that his conclusion would be the same in its absence. We cannot rely on speculative opinion founded on falsehood and embellishments of counsel. Cf. Whalem v. United States, 346 F.2d 812, 820–821 (D.C.Cir.) (dissent), cert. denied, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965); Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608, 617 (1957); United States v. Womack, supra. Finally, the psychiatrist concludes merely that petitioner was a "sociopathic personality" who *may* not have been competent to stand trial, without ever mentioning whether petitioner was or was not able to comprehend the proceedings or communicate with counsel, and without explaining in the least why the factors he considered pointed in the direction of the conclusion he reached. "The chief value of an expert's testimony

in this field, as in all other fields, rests upon the material from which his opinion is fashioned and the reasoning by which he progresses from his material to his conclusion; in the explanation of the disease and its dynamics, that is, how it occurred, developed, and affected the mental and emotional processes of the defendant; it does not lie in his mere expression of conclusion." Carter v. United States, supra, 252 F.2d at 617.

Accordingly, we conclude that the psychiatrist's opinion is so ill-founded, speculative and unreliable as to fail to raise an issue of fact as to petitioner's competence to stand trial.

■ Petitioner's allegation that as a child he suffered two head injuries requiring a total of thirteen or fourteen stitches is also insufficient to raise an issue. There is no indication that these injuries were more serious than other common childhood injuries and no support for the implicit suggestion that they adversely affected petitioner's mental health. Bare allegations of apparently non-serious head injuries do not require us to hold a hearing. Cf. Dickey v. United States, 345 F.2d 508 (5th Cir. 1965); Kenner v. United States, 286 F.2d 208 (8th Cir. 1960).

■ Petitioner's unsupported allegation that in 1943 or 1944 he was rejected for service by the Merchant Marine as mentally unstable adds nothing to his other allegations. Assuming its truth, that fact is wholly unworthy of serious consideration in determining mental competency to stand trial almost twenty years later, especially since petitioner was subsequently accepted for service in the Army and since he does not allege that he has ever undergone psychiatric examination, observation or treatment, before or after trial, in or out of prison, cf. Roe v. United States, 325 F.2d 556 (8th Cir. 1963); United States v. Cannon, 310 F.2d 841 (2d Cir. 1962); Navedo Santos v. United States, 305 F.2d 372 (1st Cir. 1962); Bostic v. United States, 112 U.S.App.D.C. 17, 298 F.2d 678 (1961); Gregori v. United States, 243 F.2d 48, 53–54 (5th

582

Cir. 1957), or during his Army service, cf. Nelms v. United States, 318 F.2d 150 (4th Cir. 1963); Fisher v. United States, 317 F.2d 352 (4th Cir. 1963). Though counsel refers to petitioner's propensity towards violence and his former demimonde way of life as evidence of petitioner's general mental instability, this, like the evidence against him on the trial, only shows that petitioner was a hardened, crafty and desperate criminal.

■ Bare allegations that for a period of time preceding the chair-throwing incident, petitioner felt annoyed, tense, irritated, needled and quarrelsome, and that he suffered from constant headaches and nervous tension are patently insufficient to require a hearing concerning petitioner's mental competency to stand trial. Burrow v. United States, 301 F.2d 442 (8th Cir.), cert. denied, 371 U. S. 894, 83 S.Ct. 193, 9 L.Ed.2d 126 (1962); United States v. McNicholas, 298 F.2d 914 (4th Cir.), cert. denied, 369 U.S. 878, 82 S.Ct. 1150, 8 L.Ed.2d 280 (1962); United States v. Rosenberg, 200 F.2d 666, 668 (2d Cir. 1952), cert. denied, 345 U.S. 965, 73 S.Ct. 949, 97 L.Ed. 1384 (1953); United States v. Molino, 240 F. Supp. 332 (S.D.N.Y.1965). Indeed, we would be seriously concerned about petitioner's mental competency if, confronted by a probable twenty years in prison, he did not experience considerable worry. United States v. Burdette, 161 F.Supp. 326, 330 (E.D.Mich.1957), aff'd, 254 F. 2d 610 (6th Cir. 1958), cert. denied, 359 U.S. 976, 79 S.Ct. 887, 3 L.Ed.2d 842 (1959).

■ This leaves only one allegation to be considered: the naked fact that petitioner threw the witness chair at the prosecutor. That fact, in the context of this multi-defendant conspiracy case, is insufficient to raise the question of incompetency to stand trial. Cf. Lebron v. United States, 97 U.S.App.D.C. 133, 229 F.2d 16 (1955), cert. denied, 351 U.S. 974, 76 S.Ct. 1035, 100 L.Ed. 1492 (1956).

As we have already demonstrated, this trial was outrageously marred by deliberate attempts to abort the trial, and in the light of the transparent plot, throwing a chair is neither bizarre nor irrational but an easy device to escape justice by provoking a mistrial whenever a defendant chooses. United States v. Aviles, 274 F. 2d 179, 193 (2d Cir.), cert. denied, 362 U.S. 974, 982, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960). The atmosphere at trial, petitioner's own statements at the various proceedings, and the deliberate lying in petitioner's present affidavit, cf. United States ex rel. Rambert v. State of New York, 358 F.2d 715 (2d Cir. 1966), all combine to produce an overwhelming and irresistible conclusion that to hold a hearing in this case would be to make a mockery of post-conviction remedies. If this is not a case in which the files and records conclusively show the absolute worthlessness of a petitioner's claims, then § 2255 gives every prisoner who is unsqueamish about perjury an ironclad right to a hearing. We conclude that the files and records of this case show beyond doubt that there is no basis for relief on the grounds urged by petitioner.

■ This brings us to the motion to disqualify this court from considering this § 2255 application. Title 28 U.S.C. § 455 provides that:

"Any * * * judge of the United States shall disqualify himself in any case in which he * * * is or has been a material witness, * * * as to render it improper, in his opinion, for him to sit on the trial, appeal or other proceeding therein."

Petitioner contends that, since the trial judge denied his motion for a psychiatric examination on the basis of his observations of petitioner and his co-defendants during pre-trial and trial, the judge might well be called as a material witness at the hearing on petitioner's § 2255 motion (were such a hearing granted). Manifestly, the trial judge knows what he saw and heard in the courtroom. We think, however, that such knowledge does not disqualify the trial judge as a "material witness" on an application under § 2255.

An application for collateral relief under § 2255 must be filed in the sentencing

court, rather than in the district court where the prisoner is confined, as was the practice under habeas corpus, precisely because the sentencing judge does have intimate knowledge of the facts and circumstances of the case. This statutory requirement was designed to relieve other judges from the labor of learning the facts from a cold and often voluminous record and to correct the unseemly practice under habeas corpus of pitting the credibility of a United States district judge against that of a convicted criminal. Equally imperative was the congressional purpose of preventing a disruption of judicial business while the trial judge was absent from his own court testifying in another. This congressional design to supplant a cumbersome, expensive and highly unsatisfactory procedure with a sound, efficient and practical one, would be wholly frustrated if the trial and sentencing judge were disqualified as a material witness under § 455 in a § 2255 proceeding merely because he knows what happened in his courtroom during the challenged conviction. United States v. Smith, 337 F.2d 49 (4th Cir. 1964), cert. denied, 381 U.S. 916, 85 S.Ct. 1542, 14 L.Ed.2d 436 (1965). See also United States v. Hughes, 325 F.2d 789, 792–793 (2d Cir.), cert. denied, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 178 (1964). Moreover, a literal reading of § 455 shows that disqualification is required only if the court *is* (or has been) a material witness, and at this stage of this application, no one *is* a material witness. Here, the only issue is whether petitioner is entitled to a hearing, United States v. Hughes, supra, an issue we have resolved in the negative.

A second ground urged by petitioner as a basis for disqualification is that the court "has previously shown an intense personal bias and prejudice against" him. Title 28 U.S.C. § 144 provides that:

"Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice * * * against him * * * such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

Disregarding embellishments, arguments and conclusions, the only facts alleged by petitioner are that the trial judge denied his motion for a psychiatric examination, held him in contempt, and in stating its reasons for denying the motions, remarked that petitioner's behavior at trial was "wilful and deliberate, designed to provoke a mistrial or terrorize this jury or the court," and that his alleged sleepiness and inability to communicate with counsel was a "put-up job" and a "fake." Petitioner adds that upon sentencing him for contempt, the court said that petitioner thought from the fact that his previous twenty-day sentence for contempt had been characterized as "severe" by the Court of Appeals, that he had "a license to break up this trial with the most outrageous conduct that has ever come to the attention of this Court in any trial. * * * You merit the sentence which the Court has given you. Take him out."

■■■ In determining the question of personal bias or prejudice, the judge "must look solely to the facts alleged in support of such charge. His duty to deny the affidavit on insufficient allegations is no less imperative than to allow it on sufficient allegations." Tucker v. Kerner, 186 F.2d 79, 85 (7th Cir. 1950). See also Rosen v. Sugarman, 357 F.2d 794, 797–798 (2d Cir. 1966). Here, all that petitioner shows is that the trial court denied his motion for a psychiatric examination, gave its reasons for finding bad faith, and held petitioner in contempt, again with a statement of its reasons. This showing is patently insufficient to establish personal bias or prejudice. Rosen v. Sugarman, supra.; Barnes v. United States, 241 F.2d 252 (9th Cir. 1956); Chessman v. Teets, 239 F.2d 205, 215 (9th Cir. 1956), rev'd on other grounds, 354 U.S. 156, 77 S.Ct. 1127, 1 L. Ed.2d 1253 (1957); Foster v. Medina, 170 F.2d 632 (2d Cir. 1948), cert. denied, 335 U.S. 909, 69 S.Ct. 412, 93 L.Ed. 442 (1949); United States v. Valenti, 120 F.

Supp. 80 (D.N.J.1954). It may be that our actions, taken out of context and painted with the facile brush so evident here, "exhibit a bent of mind fatal to impartiality of judgment," Rosen v. Sugarman, supra, 357 F.2d at 798, but we think, as petitioner himself suggests, that the total record must be considered, and taking the record as a whole, we find nothing which in any way suggests a personal bias or prejudice against him. Quite the contrary, we think the record shows that we were solicitous of his plight to the point of telling him several times that he ought to try to make a good impression on the jury.

Our conclusion is reinforced when we remember that all our rulings, comments and actions were carefully scrutinized upon appellate review where detached judicial minds found them wholly free from bias or prejudice. Rejecting the charge of prejudice leveled against us on appeal, the court stated, *inter alia:*

> "All appellants also contend that the trial judge's attitude towards the defendants and their counsel, as revealed by his comments and rulings, prejudiced the jury against them. To support these claims, appellants direct our attention to isolated incidents, invariably taken out of context, and ask us to conclude therefrom that the trial judge abandoned his proper sense of impartiality and placed the weight of his position on the side of the prosecution.

> The trial judge, in his attempt to bring this case to trial and to see it brought to an orderly and expeditious conclusion, was presented with a host of probelms calling for the exercise of his discretion. Having the experience of the first trial before him, he had to make certain that the trial proceeded with reasonable dispatch and, at the same time, guarantee that all steps be taken to safeguard the rights of the defendants. In view of the unprecedented tactics employed to impede the continuance and resolution of this trial, we find that the actions and rulings of the trial judge were reasonable and

often necessary to prevent the frustration of justice.

\* \* \* \* \* \*

We have described sufficiently the outrageous conduct of the defendants at this trial. We find that the trial judge, notwithstanding this harassment, maintained an impartial attitude and did all in his power to safeguard the rights of the defendants and to minimize the effects of these outbursts. After the incident in question, as after all similar disturbances, the judge instructed the jury to ignore it. We find no ground for reversal here." United States v. Bentvena, supra, 319 F.2d 932–933.

We conclude that petitioner has failed to demonstrate a sufficient basis for disqualifying this court from considering his motion to vacate sentence.

Accordingly, petitioner's motion to disqualify this court is denied, and his motion to vacate sentence is denied without a hearing.

So ordered.