**Carmine PANICO and Carlie DiPietro, Movants,**

v.

**UNITED STATES of America, Respondent.**

**No. 68 Civ. 1542.**

United States District Court
S. D. New York.

Sept. 19, 1968.

---

Jerome Lewis, New York City, for movants.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York (David A. Luttinger and Michael W. Leisure, Asst. U. S. Attys., Southern Dist. of New York, of counsel), for respondent.

## OPINION

MacMAHON, District Judge.

Petitioners were two of thirteen defendants convicted by a jury after a ten-week trial of a conspiracy to import and distribute vast quantities of heroin in violation of the federal narcotics laws. They move under 28 U.S.C. § 2255 to vacate and set aside the judgments of conviction and the sentences imposed upon them on July 10, 1962. They also move to disqualify the trial court from considering their § 2255 application on the ground that the court "is [of necessity] a material witness." [1] We deny the motions because the claims asserted are irrelevant to the issue of whether petitioners were denied a fair trial, they were raised and rejected at trial and on direct appeal,[2] and they cannot be resurrected by the cumulative expert testimony proffered as new evidence.

The core of this application is a claim that petitioners were "denied a fair due process trial" because of allegedly insane conduct of a co-defendant, Salvatore Panico ("Salvatore"), during trial and rulings of the trial court with respect to it. Specifically, it is claimed that Salvatore made "atrocious verbal and physical outbursts of violence" during the trial which "must have antagonized the jury" against him and all of the co-defendants so as to make it impossible, or strongly unlikely, that the jury would give fair and unprejudicial consideration to defendants' guilt or innocence. Overlooking their own contemptuous conduct before the jury, petitioners assert that Salvatore's conduct was particularly prejudicial to them because he was closely identified with his brother, Carmine Panico, and because some of Salvatore's outbursts accused DiPietro of being a "convicted dope pusher." Scaling down the claim of raging insanity made at trial, they argue that Salvatore, if not a raving maniac, was at least in the grip of emotional forces of a psychotic nature which made his conduct and outbursts uncontrollable. They contend that the trial court should have conducted further psychiatric hearings and have granted defendants' motions for a severance, even if Salvatore were found sane, in order to insure against prejudice to them. Finally, it is asserted that post-trial medical information concerning Salvatore, which first came to light after the sentencing of the defendants and which is now supplemented by an affidavit of a psychiatric consultant, shows that the trial judge erred in finding that Salvatore was mentally competent and that his acts were deliberate and calculated to disrupt the trial.[3] Thus, the entire thrust of the affidavits supporting this application is an attempt to show that due to a psychotic condition Salvatore was unable to control his conduct during the trial. All of these claims are irrelevant to the question of whether petitioners were denied a fair trial, and all were raised and rejected at trial and on direct appeal. We, therefore, reject them here. We turn now to the facts.

This application cannot be understood in the vacuum portrayed by petitioners. Rather, a realistic approach demands that Salvatore's conduct during trial be viewed not in isolation, but in the context

---

1. 28 U.S.C. § 455.

2. United States v. Bentvena, 319 F.2d 916 (2d Cir.), cert. denied [Ormento v. United States, DiPietro v. United States, Fernandez v. United States, Panico v. United States, Mancino v. United States, Sciremammano v. United States, Mirra v. United States], 375 U.S. 940, 84 S.Ct. 360, 11 L.Ed.2d 272 (1963).

3. Counsel confuses our later finding on adjudging Salvatore guilty of contempt with our earlier finding that he was capable of standing trial.

of the entire trial.[4] Petitioners were two of twenty-nine defendants accused of violating the federal narcotics laws. They were tried for the second time with twelve co-defendants, and all but one were convicted.

The second trial, which lasted ten weeks, had been preceded a year earlier by a trial which had crawled "along its rocky road for six months over every conceivable type of obstruction and interruption" before ending in a mistrial on the eve of summations when "the foreman of the jury broke his back in an unexplained fall down a flight of stairs in an abandoned building in the middle of the night."[5] The first trial was so "bedeviled by frequent delays" and "impeded by apparent illness, accident and other misfortune"[6] that the trial judge, to insure defendants' continued presence, ordered their remand. Upon appeal from that order, the Court of Appeals, after tallying an array of incidents, remarked that the "trial judge may well have detected a general pattern of conduct not attributable to less than all of the defendants."[7] Two of the defendants were held in contempt at the conclusion of the first trial, and the contempts were affirmed on appeal.[8]

Between trials, the defendants were enlarged on bail. The case appeared on the trial calendar monthly but was adjourned on each occasion because a number of defendants claimed they were unable to retain counsel, notwithstanding their ability to raise substantial bail. As early as July 31, 1961, Judge Murphy noted that the failure to retain counsel was part of a plan to postpone trial. Despite efforts of the court, including threats of contempt proceedings, it was not until March 9, 1962 that all defendants who had not been severed on government motion had counsel, either retained or appointed by the court.

At a pretrial conference held in March, the trial date for the second trial was set peremptorily for April 2, 1962. Despite that, on the appointed day, one defense counsel had a recurrence of a chronic heart condition, there were numerous switches and substitutions of counsel, and the Panicos' counsel, Mr. Aronne, although retained on September 6, 1961, was engaged in another trial which was expected to last for one week. The court denied applications for adjournment and assigned George Todaro, Esq., who had been through the first trial, to represent the Panicos and the defendant Loicano. During the empanelling of the jury, Salvatore made his first outburst. It was echoed a few minutes later by defendant Loicano.

Two days later, on April 4, the court found it necessary to remand all of the defendants. The remand was affirmed by the Court of Appeals which stated that

---

4. Some glimpse of the parallel, outrageous and unprecedented conduct of the defendants in this case, designed to frustrate, delay, abort, or inject reversible error into, the trial may be gained by referring to some of the related cases in this and the appellate courts: United States v. Bentvena, 288 F.2d 442 (2d Cir.), aff'd sub nom. Fernandez v. United States, 81 S.Ct. 642, 5 L.Ed.2d 683 (1961); United States v. Galante, 298 F.2d 72 (2d Cir. 1962); Loicano v. MacMahon, Docket No. 27487, 2d Cir., Apr. 4, 1962; United States v. DiPietro, 302 F.2d 612 (2d Cir. 1962) (per curiam); United States v. Bentvena, 304 F.2d 883 (2d Cir.) (per curiam), cert. denied sub nom. Mirra v. United States, 371 U.S. 927, 83 S.Ct. 296, 9 L.Ed.2d 234 (1962); United States v. Bentvena, 308 F.2d 47 (2d Cir. 1962); United States v. Galante, 308 F.2d 63 (2d

Cir. 1962); United States v. Panico, 308 F.2d 125 (2d Cir. 1962), vacated and remanded, 375 U.S. 29, 84 S.Ct. 19, 11 L.Ed. 2d 1 (1963); United States v. Bentvena, supra, 319 F.2d 916; United States v. Mirra, 220 F.Supp. 361 (S.D.N.Y.1963); Mirra v. United States, 255 F.Supp. 570 (S.D.N.Y.1966), aff'd, 379 F.2d 782 (2d Cir.), cert. denied, 389 U.S. 1022, 88 S. Ct. 593, 19 L.Ed.2d 667 (1967); Sciremammano v. United States, Docket No. 67 Civ. 3546, S.D.N.Y., Dec. 6, 1967.

5. United States v. Bentvena, supra, 319 F.2d at 929.

6. United States v. Bentvena, supra, 288 F.2d at 445.

7. Id. at 446.

8. United States v. Galante, supra, 298 F.2d 72.

the incidents on which we had relied "might well seem to indicate a renewal of the 'misadventures' of the previous trial * * *." [9] The problems were just beginning. Hardly a minute passed without a chorus of motions for mistrial, severance, etc. The court was swamped with applications for delay, continuance and adjournment. All of this prompted Judge Moore, on the basis of nothing but the cold record, to observe that: "One with a bent for statistics would find, no doubt, that if this trial were continued on every occasion that one or more of the defendants or their counsel so requested the trial would still be in progress." [10] Defendants resorted to every conceivable means to interrupt, delay and abort the trial, inject or provoke reversible error, or plant the seeds for collateral relief.

Certain defense counsel were repeatedly and inexcusably tardy. Throughout the trial, defendants and certain defense counsel claimed numerous incapacitating illnesses and injuries which physical examinations failed to substantiate. Several defendants claimed inability to understand the proceedings and consult with counsel due to aspirin-like medication administered by prison medical personnel. Five (out of fourteen) defendants, including Salvatore, claimed insanity and applied for psychiatric examinations. Verbal outbursts were commonplace. On one occasion, defendant Ormento tried to break into the robing room, screaming obscenities at the judge. On another, defendant Mirra, stealing Salvatore's line, shouted, "they are all dope pushers," when asked on the stand if he knew certain co-defendants. The next morning, while under cross-examination, Mirra picked up the witness chair and threw it at the Assistant United States Attorney. The chair missed the Assistant but struck and shattered against the jury box. Petitioner Carmine Panico screamed obscenities at the court and prosecutor. Petitioner DiPietro threatened to strangle Salvatore. Referring to such misconduct, the Court of Appeals said:

> "We have described only two of the more dramatic disturbances which plagued the trial of this case for we find it neither necessary nor judicious to publicize or preserve the vile language and rebellious conduct that characterized this trial. Suffice it to say that more abhorrent conduct in a federal court and before a federal judge would be difficult to conceive." [11]

The courtroom antics were interspersed with offstage acts by defendants and certain of their counsel which always interrupted and delayed the trial. The actions of the trial court, so righteously protested by petitioners, were actually forced and necessary responses to the unprecedented efforts of the defendants, including both petitioners, to thwart a fair, orderly and completed trial. [12] In order to keep order and prevent a frustration of justice, we were compelled, among other things, to station a large number of marshals in the courtroom, search spectators, and have both Panicos and Mirra gagged and shackled during the latter part of the trial. Reviewing these measures, the Court of Appeals said:

> "If any one distinct impression is gained from a scrutiny of the record here, it is that the trial judge was justified, indeed was forced, to resort

9. United States v. DiPierto, supra, 302 F. 2d at 613.

10. United States v. Bentvena, supra, 319 F. 2d at 936.

11. Id. at 930.

12. This was rational conduct. Defendants had seen the overwhelming evidence against them on the first trial. Contempt was nothing compared to the mandatory sentences they faced if convicted. The tactics succeeded on the first trial, where, out of a possible 107 court days between the commencement of the trial on November 21, 1960 and the foreman's mysterious fall on April 12, 1961, no proceedings were held on 32 days because of sicknesses, injuries and inexcusable absences.

to stern measures to obtain order in his courtroom." [13]

On defendant Galante's application for bail, the Court of Appeals held that this misconduct demonstrated "a concerted effort to interfere with the judicial process * * *." [14] That conclusion was shared by nine different appellate judges who, in one context or another, have reviewed the conduct of the defendants at either or both of their trials.[15] Referring to that conduct, the Court of Appeals said:

"We have satisfied ourselves that the prosecution did not provoke the incidents. The judge did all in his power to minimize their effect, and we find no ground for reversal in the circumstances. Any other answer to these contentions would produce little less than anarchy.

* * * * * *

Law enforcement and fair trial for those accused of violations is not to be limited to the pattern chosen by defendants. The administration of criminal justice in the federal courts will not be delivered into the hands of those who could gain only from its subversion. Our decision in Aviles is as applicable to a trial of two defendants as it is to a trial of fourteen. It may take two to conspire but it takes only one to throw a chair at a prosecutor.

* * * * * *

In view of the unprecedented tactics employed to impede the continuance and resolution of this trial, we find

that the actions and rulings of the trial judge were reasonable and often necessary to prevent the frustration of justice." [16]

At the end of the trial, we held eleven defendants, including both petitioners, in contempt for their misconduct. Most of the contempts were clear and the sentences short, resulting in expeditious appeals.[17] All convictions, except Salvatore's, were either dismissed as moot or affirmed on July 20, 1962.[18] Decision as to Salvatore was reserved, however, until September 14, 1962, when his conviction was affirmed, Judge Friendly dissenting. The Supreme Court, Mr. Justices Clark and Harlan dissenting, reversed Salvatore's contempt conviction and remanded it for a plenary hearing on the issue of his competence to form the requisite criminal intent.

The confines of this opinion preclude even an outline of the machinations that fill nearly 10,000 pages of transcript and more than 500 exhibits, including over 200 court exhibits, produced on this ten-week trial. We think, however, that the above summary demonstrates why the issues raised here cannot be resolved without regard to the context of the entire trial and appellate proceedings.

The allegedly insane trial conduct of Salvatore, post-conviction psychiatric data respecting him, and the Supreme Court's reversal of his summary contempt conviction for a hearing on his capacity to form a criminal intent form the basis of petitioners' claims.

13. United States v. Bentvena, supra, 319 F.2d at 930–931.

14. United States v. Galante, supra, 308 F. 2d at 64.

15. See United States v. Bentvena, supra, 288 F.2d 442 (Chief Judge Lumbard; Judge Waterman and Judge Madden, United States Court of Claims, sitting by designation); United States v. DiPietro, supra, 302 F.2d 612 (per curiam) (Judges Friendly, Smith and Marshall); United States v. Bentvena, supra, 308 F.2d 47 (Chief Judge Lumbard); United States v. Galante, supra, 308 F.2d 63 (Judge Kaufman); United States v. Panico, supra, 308 F.2d 125 (Judges Moore and Smith, Judge Friendly dissenting), vacated and remanded, 375 U.S. 29, 84 S.Ct. 19, 11 L.Ed.2d 1; United States v. Bentvena, supra, 319 F.2d 916 (Judges Moore, Smith and Hays).

16. United States v. Bentvena, supra, 319 F.2d at 931–932.

17. Salvatore's petition for a writ of certiorari, p. 4, complains that the record was so inadequate that a meaningful review was impossible.

18. United States v. Bentvena, supra, 304 F.2d 883.

Before detailing Salvatore's trial conduct, we note that most of the conduct portrayed in the supporting affidavits occurred in the absence of the jury. Petitioners also view Salvatore's conduct in a vacuum out of the context of the parallel conduct of ten of his co-defendants, including petitioners, and the popularity of the insanity claim during trial.[19] We turn now to the particular facts.

As noted earlier, on the morning of trial, the Panicos' counsel, Mr. Aronne, although retained on September 6, 1961, was engaged in another trial which was expected to last for one week (Tr. 598). Applications for still further adjournments were denied. Over the Panicos' objection, the court assigned George Todaro, Esq., who had been through the first trial, to represent them and defendant Loicano until their retained counsel returned or they obtained other counsel (Tr. 598, 604–616).[20] We directed the prosecution not to put in evidence directly relating to the Panicos or Loicano until their retained counsel returned. The prosecution obeyed.

While the jury was being empanelled, Salvatore started the torrent of disruptive outbursts which plagued the trial. He shouted:

"Do these people know I don't have a lawyer? What is this, Russia? There's nobody representing me here." (Tr. 58–59.)

A few minutes later, referring to Mr. Todaro, he shouted:

"I don't want to talk to him. I am not going to talk to him, I paid a lawyer. I won't talk to you." (Tr. 123.)

The court specifically instructed the panel of veniremen to disregard both outbursts and not to draw any inference against any defendant. We also talked with both Panicos out of the presence of the jury and in the presence of their assigned counsel. At that point, Salvatore calmly and coherently insisted that he did not wish to be represented by Mr. Todaro but was eager instead to continue with Mr. Aronne (Tr. 189–193a).[21] We explained that Mr. Todaro was an able and experienced lawyer familiar with the case, that Mr. Aronne would return by the end of the week, and that the vital stage of the case would not be reached until then.

Except for the two incidents mentioned, there were no further disturbances by Salvatore in the presence of the jury until sixteen days later, on the morning of April 18, when he simply advised the court that his lawyer, Mr. Aronne, had arrived in court (Tr. 1937). There was then no further misbehavior by him in the presence of the jury for over a month. Then, on the afternoon of Wednesday, May 23, 1962, after a brief recess, just as the judge entered the courtroom, he stepped into the jury box, walked along the inside of the rail,

19. See similar claim in Mirra v. United States, supra, 255 F.Supp. 570.

20. The appointment was challenged by mandamus, and the writ was denied. Loicano v. MacMahon, supra.

21. The Panicos' attitude toward Mr. Aronne varied markedly in inverse proportion to his availability. Before trial, on March 12, 1962, Mr. Aronne sought to withdraw, representing that he was inexperienced in federal practice and had been engaged only to answer the calendar until such time as the Panicos were financially able to retain Jerome Lewis, Esq. (counsel on the present application)

(Pretrial Tr. 67–68). The application was denied as untimely. Mr. Aronne had been admitted to the bar since 1952, and half of his practice was criminal (Pretrial Tr. 68–71). Salvatore confirmed the retainer in the terms stated by Mr. Aronne. He added that Mr. Aronne lacked ability to handle his case and wished additional time to get another lawyer, perhaps someone from Legal Aid (Pretrial Tr. 73–74). We advised that he could substitute any attorney any time, but that the trial would not be delayed for that purpose, and rejected as untimely his request that another lawyer be assigned (Pretrial Tr. 76).

pushed the jurors in the front row, and screamed:

"Get out of here. The Judge has got me guilty. Big John, Joe B, they are the junk pushers. We're innocent. My brother and I, we haven't got anything to do with this thing. They have me in jail already. Do you understand me? They have us in jail for nothing. They got us in jail. Twenty years they want to give me.

THE COURT: (To the deputy marshals) Take him out of here.

DEFENDANT SALVATORE PANICO: Twenty years, for nothing. Ruined for life. For what? Ruined for life. For what?" (Tr. 5638.)

The marshals removed Salvatore from the courtroom and, then, not to be outdone, petitioner Carmine Panico chimed in:

"I want to see my brother.

THE COURT: Sit down.

THE CLERK: Be seated.

THE COURT: Carmine Panico, you may go back in here (pointing to the cell block behind the courtroom) and see him when he calms down.

DEFENDANT CARMINE PANICO: ([* * To the Court]) You think that he's all right. What you're doing, it is a shame, it ain't fair, to allow a frame. A lousy bum like that. [* * * Pointing to the Court.] A shame in your heart that you stand up there near the flag which I served for.

THE COURT: (To the deputy marshals) Take him in back [the cell block].

DEFENDANT CARMINE PANICO: [* * * Pointing to Court and Prosecutor] It is a dirty shame what you are doing, to ruin families, you bastards." (Tr. 5639.)

Carmine Panico was also removed from the courtroom (Tr. 5639a). The court immediately instructed the jury as follows:

"Ladies and gentlemen, I must tell you now that despite that, we are all under a duty here to see that every one of these defendants gets a fair trial, including Salvatore Panico and his brother Carmine, and you must disregard it. As I have told you many times, this case must be decided on the evidence and on nothing else but the evidence, and Salvatore Panico's conduct or his brother's is not evidence, and you must not let it influence you in determining the guilt or innocence of any defendant, particularly the two Panicos." (Tr. 5640.)

The jury was then excluded and motions by all defendants for a mistrial and for a severance on the ground that the incidents had prejudiced their right to a fair trial were denied (Tr. 5657–5661). The jury was recalled and further instructed:

"Ladies and gentlemen, we are about to recess. I ask you, as calm and intelligent and dispassionate human beings, as fair impartial people to put that incident out of your minds and don't let it prejudice you against any defendant in this case, particularly the ones who are involved." (Tr. 5662.)

The next day, Thursday, May 24, 1962, to avoid agitation of the defendants and the constant delay and interruption of the trial created by a barrage of motions, we directed all counsel to reserve all motions, including those for a mistrial, until the close of the day. Mr. Aronne, immediately flouting our instruction, applied for psychiatric examinations of both Panicos claiming they "were both a little balmy" (Tr. 5679). Shortly after this application, during testimony of a witness, Mirra, who also claimed insanity, and Salvatore joined in the following disruption:

"Q Do you know a person named Anthony Mirra?

A Yes, I do.

Q Do you see him in the courtroom?

A There he is over there, the third from the right.

THE COURT: He happens to be the fifth from the right, but I will

take it. Let the record reflect he identified Mirra after he stood up.

DEFENDANT MIRRA: Let the record reflect he can't see over here.

Q I direct your attention—

THE COURT: Take him out.

MR. LUNEY: What was your Honor's direction?

THE COURT: Remove Mirra from the courtroom.

(The marshals escorted defendant Mirra from the courtroom.)

MR. COSENTINO: This demonstration, your Honor, I ask for the withdrawal of a juror and for a mistrial.

MR. PELUSO: I join in that motion.

THE COURT: Denied. Proceed.

MR. KRIEGER: This puts me in a particularly difficult position.

THE COURT: Proceed.

MR. KRIEGER: I am proceeding in an empty fashion.

THE COURT: Proceed.

MR. LUNEY: May the record reflect that the witness from where he is sitting cannot see the two people who are sitting at the end of the table?

THE COURT: He can see if he he stands up. He may stand up.

DEFENDANT SALVATORE PANICO: Let the record reflect that he can see the good-looking Carlie and the other punk there—the other good-looking pushers there.

THE COURT: Take him out.

DEFENDANT SALVATORE PANICO: Yes, take me out.

MR. PELUSO: I move for a mistrial.

MR. LUNEY: I join in that.

THE COURT: Denied.

(The marshals escorted defendant Salvatore Panico from the courtroom.)" (Tr. 5706–5708.)

As the foregoing shows, despite our instructions, the fracas was followed by a disrupting course of motions for a mistrial. We denied them and again instructed the jury to disregard the outbursts (Tr. 5708, 5869). Mr. Aronne, counsel for the Panicos, and Mr. Krieger, counsel for DiPietro, made motions for a psychiatric examination of Salvatore. The applications were again denied, for, among other signs of rationality, it was plain from the very contents of Salvatore's outbursts that he was attentive and knew what was going on in the courtroom (Tr. 5724–25, 5873–76).

The next day, Friday, May 25, 1962, during the first five minutes of testimony, the following occurred:

"DEFENDANT SALVATORE PANICO: Di Pietro is talking about me there. He is the convicted dope pusher. Separate me from him.

DEFENDANT DI PIETRO: Stop him. I told you, Al.

MR. KRIEGER: I move for a mistrial as far as Di Pietro is concerned." (Tr. 5889.)

Di Pietro responded:

"DEFENDANT DI PIETRO: Every one of my witnesses, he made a holler.

MR. TENDY: May the jury be excused?

THE COURT: The jury is excused. I will say as you go out you must ignore these outbursts.

(Jury left the courtroom.)

DEFENDANT DI PIETRO: I never made a sound all this time. If he comes into this courtroom when I am here, I will strangle him. He interrupted my seven witnesses. Chain him down, if you got to.

\* \* \* \* \* \*

MR. KRIEGER: My client wishes to address the Court himself. May he do it here and now?

THE COURT: No, he may not. You speak for him. You have been speaking very well.

DEFENDANT DI PIETRO: Yes. I will strangle him myself, I will get

him out of the courtroom." (Tr. 5890–93.) [22]

After this incident, DiPietro's counsel moved for a mistrial, all defendants joined, and we denied the motion (Tr. 5889–5893).

On further application of defense counsel, pursuant to 18 U.S.C. § 4244, the court ordered a psychiatric examination of Salvatore to determine whether he was mentally competent to stand trial (Tr. 5889–5895). Dr. Vitold Arnett, a psychiatrist, was summoned to the courthouse and there briefly interviewed Salvatore. Dr. Arnett reported to the court that Salvatore was "not capable of undergoing a trial at this point" (Tr. 5906). The trial was recessed for the day.

On Monday morning, May 28, the recess was continued until May 31, and, pursuant to the command of 18 U.S.C. § 4244, Salvatore was ordered taken to Bellevue Hospital for a thorough psychiatric examination as to his mental competence to stand trial, and Tuesday, May 29, was set for a hearing on that question. The court appointed Dr.

George Hyslop, a well-qualified psychiatrist,[23] to conduct the examination along with Dr. Arnett. Mr. Aronne engaged Dr. Theodore S. Weiss (Tr. 5950–55).

Dr. Hyslop examined Salvatore on both May 28 and the morning of May 29. Dr. Arnett also examined him on the morning of May 29, as well as on May 25, shortly after his outburst. Dr. Weiss examined him on the morning of May 31 (Tr. 6023). All three psychiatrists testified at the hearing. Drs. Hyslop and Arnett testified at the hearing that Salvatore understood the nature of the charge against him, that he was able to discuss the facts with his lawyer, that his speech was clear and coherent, and that he was able to understand what the witnesses were saying and discuss the facts with counsel (Tr. 5968–69, 5998–99). Dr. Weiss testified that Salvatore was paranoid[24] and did not "comprehend fully" the proceedings against him (Tr. 6026). All agreed that there was no history of mental illness of any kind. On the basis of this testimony, the demeanor of the experts on the stand, and our own observation of Salvatore[25] and his co-

22. DiPietro's threat to strangle Salvatore demonstrates that Salvatore's complaint to examining psychiatrists that his life was being threatened by DiPietro and other defendants at the detention center was not a delusion but an actual fact. Those psychiatrists, who thought him to be suffering from paranoia, believed these threats and similar objective facts found in this record were delusions. That erroneous belief undermines their conclusion.

23. Bachelor of Arts 1913; Master of Arts in psychology 1914; teaching fellow in psychology at Indiana University; medical school Cornell University 1915–19; licensed 1919; practiced neurology and psychiatry since 1922; served at Bellevue Hospital as neurologist and taught neurology at Cornell 1923–33; neurologist and psychiatrist at Memorial Hospital from 1923 until retirement in 1958; served in Neurological Institute from January 1922 until retirement in 1958; examiner of the American Board of Psychiatry and Neurology; served in the Naval Reserve from 1934 until retired in 1942 and in the Veterans Bureau as a psychiatrist and neurologist from 1922 to 1927; impartial panel expert in neurology and psychiatry for

the New York State Workmen's Compensation Board; consultant to the United States Department of Labor in neurology and psychiatry; author of thirty-five articles and two textbooks (Tr. 5958–5960).

24. Dr. Weiss gave as the basis for his diagnosis that Salvatore was suffering from delusions of persecution, to wit, that he was "framed," was the innocent victim of a "stool pigeon," and had been threatened with strangulation by DiPietro and the other defendants who were members of the "Black Hand" ("Mafia"). We heard DiPietro's threats. Moreover, every defendant claimed innocent "frame-up" and that the government's principal witness was a lying "stool pigeon." We could not credit the testimony of Dr. Weiss or Dr. Arnett, even if we had been otherwise impressed by them, because what they said were delusions were objective realities.

25. Throughout the trial, Salvatore cannily and articulately sought to manipulate his counsel situation. Because of this, we spoke to him directly in the robing room several times. (See Pretrial Tr. 73–76, 616–618; Tr. 189–193a, 304–305a,

defendants over a period of ten weeks, we found that Salvatore was competent to stand trial (Tr. 6045). A motion by Salvatore's counsel to sever him was denied (Tr. 6049). At the conclusion of the hearing, the court warned Salvatore that any further outbursts would force the court to have him gagged.

On May 31, 1962, the trial was resumed, and Salvatore again disrupted the proceedings with an outburst directed, this time, at defendant Galante. He was again removed from the courtroom (Tr. 6083). The court ordered that he be gagged and shackled to restrain him from any further outburst or other disruptive conduct in the courtroom. During the remainder of the trial, he remained gagged and shackled, and there were no further incidents in the presence of the jury.

Thwarted in the courtroom, Salvatore's disrupting misconduct continued offstage in the Federal House of Detention. He twice made attempts at suicide, each time in the midst of others, under circumstances which made success impossible. In the early morning hours of June 7, he was found in his cell, which he shared with his brother Carmine and two others, hanging with a belt around his neck. He was released by a prison guard and one of his cellmates, who was holding him up when the guard arrived on the scene a few seconds after Salvatore had kicked the chair out from under him. He was never unconscious and suffered no ill effects. He conversed coherently with the guard and had full use of his faculties immediately after the incident (Court's Exh. 150–A; Tr. 6971–6981).

On Friday morning, June 8, at about 8:50 A.M., Salvatore entered the shower room at the detention center with his brother Carmine and several other prisoners. At about 8:55 A.M., a senior correction officer heard a commotion and found Salvatore writhing on the floor of the shower room. He was bleeding from fourteen evenly-spaced shallow cuts he

had inflicted on his forearms with a razor blade (Tr. 7181–84). Taken to St. Vincent's Hospital at about 9:30 A.M., he was given first aid. His loss of blood was small. He was bandaged and returned to the detention center by noon in good physical condition (Court's Exhs. 188 and 205). Again the trial was recessed for the day.

On June 18, 1962, the Court of Appeals, on application of the defendants, directed another psychiatric examination of Salvatore's competence to stand trial. He was examined again by Dr. Hyslop, who reported, in response to seven specific questions submitted by the court directed to the question of Salvatore's competence to stand trial and, mindful that contempt was in the offing, to his competence to form a criminal intent, that Salvatore was able to: (1) understand that he was charged with a violation of the narcotics laws, (2) understand what the witnesses were saying, (3) discuss the facts with his lawyer with a reasonable degree of rational understanding, (4) communicate with clear and coherent speech, and (5) remember events clearly. In response to our *McNaughton* questions, he further stated (6) that Salvatore was conscious of the nature and quality of his acts and (7) capable of distinguishing between right and wrong (Court's Exh. 205, pp. 9–10). On the basis of the report, earlier testimony, and our own observation of Salvatore's rational behavior, we found not only that he was competent to stand trial, but also that he was capable of forming a criminal intent.

After every one of the outbursts by Salvatore and others, we instructed the jury to disregard them and not consider them against any defendant in any way. When it became clear that Salvatore, his brother, and Mirra would continue to flout our orders and disregard the trial, despite our warnings against any further disturbances, the court directed that they be gagged and shackled to prevent prejudicial outbursts or conduct directed at

620–624, 3517–3520, 3579–3583.) The timing and content of his outbursts were patently designed to arouse the greatest

prejudice in the fewest words against codefendants higher than he was in the hierarchy of the conspiracy.

other defendants. We even went to the extreme of preventing Salvatore from taking the stand, not because we thought him insane or were unaware of a defendant's usual right to testify in his own behalf (18 U.S.C. § 3481), but because it was perfectly clear, as his own words show whenever the gag was removed (Tr. 8256–8270), that he planned to use the witness stand as a stage for irrelevant, inadmissible and prejudicial accusations against co-defendants, just as Mirra did earlier, set the stage for a mistrial, reversible error, or plant a basis for collateral relief. Finally, the court's charge strongly and unequivocally instructed the jury:

> "As I have repeatedly instructed you throughout this trial, misconduct and outbursts, disturbances and remarks by any defendant on such occasions are not evidence and are not to be considered by you in determining the guilt or innocence of such defendant or any other defendant in this case. Nor are you to draw any inference against any defendant or be influenced in any way by any measures which the court has taken to insure the orderly conduct of this trial. Such matters are not evidence, and you must put them entirely out of your mind. The orderly conduct of the trial and the measures necessary to insure it are the exclusive responsibility of the Court. They are no part of your function. You are, therefore, to draw no inference against any defendant from the Court's actions in that regard.

> \* \* \* \* \* \*

> What the law requires, then is calm, cool and deliberate consideration of the evidence. The law does not permit you to be governed by guesswork, passion, fear, favor, prejudice, public opinion, the nature of the charge, the remarks, outburst or conduct of any defendant during the trial, or by anything other than a fair and impartial consideration of the evidence." (Tr. 8714–17.)

Having reviewed the record, we turn to the contentions made here.

■ As we noted above, the entire thrust of the present § 2255 petition is an attempt to show that Salvatore's conduct at trial was the result of either insanity or uncontrollable emotional impulses. Petitioners contend that if their supporting papers raise an issue of fact as to the uncontrollability of Salvatore's conduct, an evidentiary hearing must be held, and if their contention is established they are entitled to relief under § 2255. They are mistaken.

■ Cutting through the clutter of distortions, half-truths, opinions, conclusions and sophistical arguments presented in petitioners' voluminous papers, the material question on this application is not whether Salvatore was sane or insane during trial, but whether his conduct deprived petitioners of a fair trial.[26] The focus of the inquiry is, thus, not on the cause of Salvatore's misconduct, but on its effect upon petitioners' rights. Whether Salvatore's behavior was deliberate and calculated or involuntary and uncontrollable is, therefore, irrelevant to the question of the effect of his behavior on the jury and the adequacy of the trial court's measures and instructions to preserve the proper atmosphere for thoughtful deliberation.

■ Even if every allegation in petitioners' papers as to Salvatore's mental or emotional state during, or since, trial were accepted as true, nothing would be established which would entitle petitioners to relief. We conclude, then, that the contention that Salvatore was so mentally ill or emotionally disturbed during trial that he was unable to control his conduct, which petitioners' voluminous papers are intended to support, is irrelevant to the ultimate legal question of whether petitioners received a fair trial. This finding is sufficient by itself to deny this application without a hearing, but, for the sake of completeness, we will consider petitioners' other arguments.

---

26. See United States v. Aviles, 274 F.2d 179 (2d Cir.), cert. denied, 382 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960).

The material question on this claim that petitioners were denied a fair due process trial is: Did the trial judge deal adequately with the situation of possible prejudice under all the circumstances of this trial? Petitioners squarely raised that searching question on direct appeal. The Court of Appeals gave thorough consideration to it, scrutinized the record, and held that, in light of the circumstances and the history of the prior trial, the court did everything in its power to minimize the effects of the disruptive conduct and outbursts of Salvatore and others, including both petitioners, and that these steps were sufficient to protect the rights of the other defendants, including these petitioners.[27] Moreover, the identical claim raised here, that Salvatore was so mentally ill during the trial that his continued presence and conduct prejudiced petitioners' rights to a fair trial, was raised on direct appeal, thoroughly considered, and rejected by the Court of Appeals even though, as we shall see, the allegedly new information now proffered was then before the Court of Appeals. It is worth reiterating what the Court said about this tired old claim of an unfair trial:

"All appellants, even the perpetrators, complain of the prejudicial effect of the outbursts of the defendants. * * *

As to his [the trial judge's] failure to sever certain defendants and to declare a mistrial after these outbursts, we look to our recent decision in United States v. Aviles, supra. There, as here, a defendant burst into a tirade before the jury accusing his co-defendants. There, as here, the trial judge promptly instructed the jury to disregard the outbursts. We said, in answer to the contention that reversal was required:

'Manifestly it was not error to deny the mistrial motions. If such conduct by a co-defendant on trial were held to require a retrial it might never be possible to conclude a trial involving more than one defendant; it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so. Under all the circumstances the trial judge's instructions adequately dealt with the situation and his denial of the mistrial motions was proper.' 274 F.2d at 193.

This case differs from Aviles only in that the outbursts of the defendants were more numerous and more offensive. But the trial judge instructed the jury to ignore the outbursts each time they occurred. This is all that he could do apart from taking steps to prevent their repetition. We have satisfied ourselves that the prosecution did not provoke the incidents. The judge did all in his power to minimize their effect, and we find no ground for reversal in the circumstances. Any other answer to these contentions would produce little less than anarchy.

\* \* \* \* \* \*

Appellants claim that the trial judge should have severed each offending defendant after an outburst. Why this course of action was required we fail to see. After the incident had occurred, severance would not have protected the remaining defendants from any possible prejudice. It would simply have afforded each defendant an easy escape from the trial. Appellants insist, however, that Salvatore Panico should have been severed because even if he were competent to stand trial, he was so mentally ill during the trial that his continued presence and conduct prejudiced the rights of the other defendants to a fair trial. Their claim is that even if prejudice resulting from the outbursts could not have been erased, the judge was obligated to sever Salvatore Panico after it became apparent that he could not control himself and that other outbursts would be forthcoming.

Rule 14 of the Federal Rules of Criminal Procedure provides for an exercise of discretion by the trial judge as to whether, at any point in the trial,

---

27. United States v. Bentvena, supra, 319 F.2d at 930–931.

there appears to be a possibility of sufficient prejudice to any defendant to warrant a severance * * * and the exercise of that discretion will be corrected only if abused. * * * We have recently had before us the contention that Salvatore Panico could not be punished for contempt because he 'was too mentally ill to formulate the intent to be contumacious.' * * * We there quoted at length from the trial judge's certificate filed pursuant to Rule 42(a) of the Federal Rules of Criminal Procedure and concluded as follows: 'We do not think that the conclusion of Judge MacMahon with respect to the deliberate and calculated nature of defendant's acts constitutes reversible error.' * * *

Accepting that conclusion here, little remains of appellants' claims that the trial judge abused his discretion in failing to sever Panico. The trial judge found, from his own extensive observation of Panico, and from the reports of psychiatrists that examined him, that Panico's acts were deliberate and calculated to disrupt the trial. This being so, he stands in no different position than the other unruly defendants and, as we have said, there was no abuse of discretion in refusing to grant a severance because of their actions." [28]

The Supreme Court denied certiorari.[29]

■■ In light of the clear disposition on direct appeal of both the general and particular claims now asserted, petitioners are barred from raising them again in a § 2255 proceeding. "It is well settled

law that § 2255 cannot be * * * employed to relitigate questions which were raised and considered on the appeal." [30] Recognizing that principle of law and even conceding that the ultimate issue here is "identical to one which was litigated before Judge MacMahon and the reviewing court." [31] petitioners, nonetheless, argue that they are entitled to relief under § 2255 because of allegedly new facts which were neither before the trial court nor appellate courts.

■ What, then are the allegedly new facts? First, petitioners claim that after his conviction Salvatore was diagnosed a schizophrenic by a psychiatrist at Sing Sing Prison on July 12, 1962 and was committed to Dannemora State Hospital by order of a County Judge of Westchester County on August 22, 1962.[32] Assuming the truth of these allegations, they are of no help to petitioners. True, this data was not before the trial court, but, at best, it would have been cumulative expert opinion. Correspondence asserting the claim was nevertheless filed with petitioners' papers on direct appeal and distributed to the panel.[33] Moreover, it was stated as fact in petitioners' briefs on appeal and argued by both petitioners and the government.[34] It is thus untenable for petitioners to contend that it was not considered by the Court of Appeals. Moreover, nine months earlier, in his dissent on Salvatore's appeal from his contempt conviction, Judge Friendly refers to the "fact, communicated to us by counsel after the argument, that the psychiatrist at Sing Sing Prison and two others have now diagnosed Salvatore as schizophrenic * * *." [35] Thus, there

28. Id. at 930–932.

29. 375 U.S. 940, 84 S.Ct. 360, 11 L.Ed. 2d 272.

30. Castellana v. United States, 378 F.2d 231, 233 (2d Cir. 1967).

31. Lewis Affidavit, p. 4.

32. Salvatore was returned to Sing Sing Prison after his conviction in this court to continue service of a state court sentence.

33. Appendix (Supplemental) on behalf of appellants Salvatore Panico and Carmine Panico, pp. 141a–146a.

34. Brief for Carmine Panico and Salvatore Panico, p. 41; Brief for Carlie DiPietro, p. 28; Government's Brief, p. 96 n. 2.

35. United States v. Panico, supra, 308 F.2d at 129. The fact shown by the actual records is that the diagnosis of schizophrenia, paranoid to psychosis, was tentative and incorrect. It was later down-

is no merit to the claim that the proffered post-conviction psychiatric data is new or that it would in any way warrant relitigation or change the result of the rejected claim that Salvatore's continued presence and conduct at trial prejudiced the rights of petitioners to a fair trial.

The second allegedly new fact is an argument that because the Supreme Court reversed and remanded Salvatore's contempt conviction for a plenary hearing on his capacity to form a criminal intent, the Court of Appeals' earlier affirmance of petitioners' conviction on the indictment has been undermined. The argument is based on the fact that in the contempt case the Court of Appeals accepted our finding that Salvatore was sane in rejecting petitioners' claim that they were denied a fair trial. As we have seen, assuming that Salvatore was insane, the argument is of no help to petitioners, for the material question on whether petitioners received a fair trial is not the cause, but the effect, of Salvatore's conduct. In any event, the appellate history as a whole shows that the argument is untenable.

On June 13, 1963, the Court of Appeals affirmed petitioners' conviction. It rejected, *inter alia*, petitioners' claim that Salvatore was so mentally ill that his continued presence and conduct deprived them of a fair trial. In doing so, it referred to its earlier acceptance, on Salvatore's appeal from his contempt conviction, of our finding that he was sane.[36]

Nine months earlier, on September 14, 1962, the Court of Appeals, one judge dissenting, had affirmed Salvatore's conviction for contempt. There, the court, quoting our certificate, noted *inter alia* that: "A psychiatrist examined him and found him sane in all respects." The certificate also included our express finding that: "There is nothing insane about this man whatever." The majority, although aware from counsel's correspondence of the alleged post-conviction diagnosis of schizophrenia, accepted our finding that Salvatore was sane and that his acts were wilful and deliberate.[37] Our finding of sanity and wilful conduct was not based solely upon the testimony of psychiatrists, given at a hearing held in May, which was directed to the different question of Salvatore's competence to stand trial,[38] but upon parts of that testimony, on our own observation of Salvatore over a period of twelve weeks, and on the written opinion of Dr. Hyslop, given in June, that Salvatore knew the nature and quality of his acts and was capable of distinguishing between right and wrong.[39]

---

graded to psychopathic personality, depressed episode. The patient recovered and was found suitable to return to prison on September 17, 1963.

36. 319 F.2d at 932.

37. United States v. Panico, supra, 308 F. 2d at 127.

38. According to the dissent:
"He [the trial judge] places emphasis, as my brothers seem to do, on the testimony of the psychiatrists concerning Salvatore's ability to stand trial; the very fact that he found it necessary to rely on such evidence seems to show his belief that something beyond what he saw or heard appellant do was essential to conviction here." United States v. Panico, supra, 308 F.2d at 129.
The dissent continued in a footnote that, although the same conclusion (lack of power) would be reached "if the facts were otherwise, it should be pointed out

that the testimony of the psychiatrists was directed to an issue wholly different from that relevant to appellant's guilt of contempt."

39. In reply to seven specific written questions asked by us on June 18, 1962, pursuant to a writ of mandamus issued by the Court of Appeals, Dr. Hyslop, a court-appointed psychiatrist, concluded in writing on June 19, 1962 not merely that Salvatore was capable of standing trial, but also that he knew the nature and quality of his acts and was capable of distinguishing between right and wrong (Court's Exhs. 188 id. and 205 id., p. 10). We sought that opinion because we knew that summary contempt was in the offing. On July 5, Salvatore and ten others were convicted of contempt. We did not expressly refer to Dr. Hyslop's opinion in our certificate but stated our finding in conclusory terms that Salvatore was "sane in all respects." Twelve days later, on July 17, the appeals from the contempt

However, no hearing or testimony was ever taken on the issue because we acted under the summary contempt power expressed in Fed.R.Crim.P. 42(a), which, as the majority opinion notes, says nothing about a hearing. Nevertheless, in October 1963, the Supreme Court (Mr. Justices Clark and Harlan dissenting) reversed Salvatore's contempt conviction and remanded the case for a plenary hearing under Fed.R.Crim.P. 42(b) to determine whether Salvatore was criminally responsible for his conduct.[40] In the interim between its opinion affirming Salvatore's contempt conviction and the Supreme Court's reversal, the Court of Appeals affirmed petitioners' conviction on the indictment. In doing so, it rejected the argument that Salvatore was "so mentally ill during trial that his continued presence and conduct prejudiced the rights of the other defendants to a fair trial," giving as one reason its recent rejection of the "mental illness" argument on Salvatore's contempt appeal.

Seizing on that fact, petitioners argue that the Court of Appeals' rejection of the "mental illness" argument and affirmance of their conviction has been undermined. There are a number of reasons why the argument is without merit.

First, it is clear from a reading of the Court of Appeals' opinion affirming petitioners' conviction that its reason for holding that Salvatore's misconduct did not deprive petitioners of a fair trial was that the trial judge's instructions and measures adequately protected the defendants' rights.[41]

Second, the Court of Appeals' reference to its recent rejection of the "mental illness" claim was unnecessary to decision because, as we have seen, the contention is irrelevant to the issue of a fair trial.

Finally, the point was urged unsuccessfully in petitioners' application for certiorari. There, petitioners raised the same issue proffered here—that Salvatore was so mentally ill during trial that his continued presence and conduct prejudiced their rights to a fair trial.[42] Again they filed the correspondence respecting the prison diagnosis of Salvatore as a schizophrenic and his commitment to Dannemora State Hospital.[43]

In an effort to relitigate this tired issue, petitioners contend that the Supreme Court was misled by the Solicitor General in his brief opposing their application for certiorari. We find no substance to the charge. The Solicitor General, this time, did not simply demur to the hearsay correspondence filed by Mr. Lewis because it did not appear in the record, as he had on the earlier contempt case.[44] Rather, he took pains to look at

convictions were argued. Neither the government nor the court ever mentioned Dr. Hyslop's report or the facts which it supports, although it was reproduced in Salvatore's Appendix.

40.  375 U.S. 29, 84 S.Ct. 19, 11 L.Ed.2d 1.

41.  United States v. Aviles, supra.

42.  See DiPietro's Reply Brief on application for certiorari, p. 2, ¶ 4, October Term, 1963, No. 346. See also Carmine Panico's Reply Brief on application for certiorari, p. 1, October Term, 1963, No. 346.

43.  See DiPietro's petition for certiorari, pp. 26–28; Carmine Panico's petition for certiorari, p. 20.

44.  Apparently the only post-conviction data which the Court of Appeals and the Supreme Court had on Salvatore's appeal from his contempt conviction was hearsay in the form of correspondence injected

into Salvatore's Appendix by his counsel, Jerome Lewis, now counsel for these petitioners. The correspondence was not only hearsay but also did not appear in the trial record. It stated that Salvatore had been diagnosed by a prison and two court-appointed psychiatrists as a schizophrenic and had been committed to Dannemora State Hospital. The actual records, however, show that at that time the diagnosis was only tentative, later found incorrect and down-graded to psychosis with psychopathic personality. (See Lewis Affidavit, Exh. D.) The Solicitor General simply argued that the post-conviction events were not part of the record, that the government was not a party to them, that it had no opportunity to inquire into them, and that the court should therefore disregard them. (Salvatore Panico's petition for certiorari, October Term, 1962, No. 633; Brief for the United States in opposition, p. 21.)

the official records and filed all of them with the Supreme Court. His brief noted correctly that:

"the diagnosis of schizophrenia was tentative; that, on fuller examination, the New York authorities have concluded that schizophrenia was not a correct diagnosis; and that Panico was, on September 17, 1963, found suitable for return to prison." [45]

Petitioners contend that the Solicitor General's statement was a distortion of the psychiatric record because it omitted to point out that the diagnosis had been changed to

"Psychopathic Personality, Depressed Episode."

They argue that this "distortion" may not have been discovered by the Supreme Court because the prison medical records, which were submitted by the government, may have been illegible, and that the court may thus have been misled as to the seriousness of Salvatore's mental condition. The argument is frivolous. Such speculation affords no basis for the relief sought here. Moreover, as the Solicitor General noted in his reply to the charge of deception raised by DiPietro's then counsel, Salvatore's mental condition, if relevant at all, was at best peripheral, the government's summary was literally accurate and correct, the New York authorities did conclude that schizophrenia was not a correct diagnosis, Salvatore was found suitable to return to prison, the exact text of the full clinical summary was filed with and available to the court,

if any Justice wanted it, and the issue was thoroughly probed by the Supreme Court.[46]

We have given thorough consideration to the full clinical report. The exact text of the pertinent part of the records bears out the Solicitor General.[47] We conclude that the Supreme Court was not misled.

The final item of allegedly new evidence is an affidavit by Dr. Jay Katz, a psychiatrist retained by petitioners for the purpose of this application. Dr. Katz asserts that Salvatore was "helpless to control his conduct" during the 1962 trial by reason "of largely unconscious psychological forces which dominated his mind" and that his behavior was "at least akin to that of psychotic persons with paranoid tendencies." His opinion is based on a reading of various parts of the trial transcript and exhibits, on reports from psychological tests conducted in late December 1966, and on three and one-half hours of psychiatric interviews with Salvatore, held in late December 1966 and early January 1967.[48]

Dr. Katz's findings, however, are not in any meaningful sense new evidence. There were psychiatric reports and testimony during the trial by both Dr. Arnett and Dr. Weiss which reached essentially the same conclusion (Tr. 5906, 6032). Dr. Katz's report, then, is merely cumulative. It simply reiterates an expert opinion that was already considered by both the trial and appellate courts in this case.[49] The probative value of the report is also questionable, considering that it

45. Lewis Affidavit, p. 64.

46. See Lewis Affidavit, Exh. E.

47. "July 12, 1962: Tentative Diagnosis: Schizophrenia, paranoid type." (Lewis Affidavit, Exh. D: report of Dr. Norbert S. Bruckman, dated July 12, 1962, to Louis J. Kelley, Acting Warden, Sing Sing Prison.)

"September 17, 1963: He is in good contact, he shows no evidence of any symptoms suggesting Schizophrenia which was the original impression. Today at Staff his ward physician as well as the Staff and psychologists, whom he had in group therapy and recently gave psychological test, which failed to reveal

any evidence of Schizophrenia, expressed the idea that the patient has Psychopathic Personality and has not seen any evidence of Schizophrenia. Accordingly, the patient's diagnosis is changed from Schizophrenia, Paranoid to Psychosis with Psychopathic Personality, Depressed Episode. The patient has recovered and is found suitable to return to prison." (Lewis Affidavit, Exh. D: Dannermora State Hospital Clinical Summary, dated September 25, 1963, p. 4.)

48. Katz Affidavit, pp. 5–6.

49. See Dirring v. United States, 353 F. 2d 519 (1st Cir. 1965).

was based on only three and one-half hours of interviews with Salvatore four and five years after the conduct in question, and on a reading of the other reports and portions of the record. During the trial, Dr. Hyslop examined Salvatore on three occasions and noted in his report (Court's Exh. 188 id.):

"The selections from the trial record, citing instances of defendant's behavior during trial, are in my opinion of little value in determining whether or not the conduct was a product of mental disorder."

We thus conclude that the issue raised here has been raised and decided on direct appeal and that petitioners are precluded from raising it in this § 2255 proceeding. We find nothing in the supporting papers offering any new evidence not presented to the reviewing courts on the direct appeals by these petitioners. Finally, we hold that the cause of Salvatore's behavior during trial, the question to which petitioners' voluminous papers are addressed, is irrelevant to the question of whether petitioners Carmine Panico and Carlie DiPietro received a fair trial.

■■■■■■ This brings us to the motion to disqualify this court from considering this § 2255 application. Title 28 U.S.C. § 455 provides that:

"Any * * * judge of the United States shall disqualify himself in any case in which he * * * is or has been a material witness * * *."

Petitioners argue that, if a hearing were held as the result of this motion, the trial judge would be called as a witness by them. They contend, therefore, that the trial judge should disqualify himself from considering this application. We reject the argument and deny the motion. We reiterate what we said in Mirra v. United States, 255 F.Supp. 570, 582–583 (S.D.N.Y.1966), aff'd, 379 F.2d 782 (2d Cir.), cert. denied, 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967):

"An application for collateral relief under § 2255 must be filed in the sentencing court, rather than in the district court where the prisoner is confined, as was the practice under habeas corpus, precisely because the sentencing judge does have intimate knowledge of the facts and circumstances of the case. This statutory requirement was designed to relieve other judges from the labor of learning the facts from a cold and often voluminous record and to correct the unseemly practice under habeas corpus of pitting the credibility of a United States district judge against that of a convicted criminal. Equally imperative was the congressional purpose of preventing a disruption of judicial business while the trial judge was absent from his own court testifying in another. This congressional design to supplant a cumbersome, expensive and highly unsatisfactory procedure with a sound, efficient and practical one, would be wholly frustrated if the trial and sentencing judge were disqualified as a material witness under § 455 in a § 2255 proceeding merely because he knows what happened in his courtroom during the challenged conviction. United States v. Smith, 337 F.2d 49 (4th Cir. 1964), cert. denied, 381 U.S. 916, 85 S.Ct. 1542, 14 L.Ed.2d 436 (1965). See also United States v. Hughes, 325 F.2d 789, 792–793 (2d Cir.), cert. denied, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 178 (1964). Moreover, a literal reading of § 455 shows that disqualification is required only if the court *is* (or has been) a material witness, and at this stage of this application, no one *is* a material witness. Here, the only issue is whether petitioner is entitled to a hearing, United States v. Hughes, supra, an issue we have resolved in the negative."

Accordingly, petitioners' motion to disqualify the court is denied, and their motion to vacate their sentences is denied without a hearing. So ordered.